James L. Kerwin*
William E. Trachman*
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax: (877) 349-7074
jkerwin@mslegal.org
wtrachman@mslegal.org
*Pro Hac Vice status pending

Herbert G. Grey, Attorney at Law
OSB No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005
Tele: (503) 641-4908
herb@greylaw.org

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| DANIELLE JOHNSON, | |
|       Plaintiff, | |
|         v. | No. _____ |
| STATE OF OREGON, by and through the STATE OF OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY; LEAH FELDON, Director, State of Oregon Department of Environmental Quality, in her official and personal capacities; RICHARD WHITMAN, Former Director, State of Oregon Department of Environmental Quality, in his personal capacity; and PENNY ROBERTSON, Human Resources Manager, State of Oregon Department of Environmental Quality, in her official and personal capacities. | **COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |
|       Defendants. | |

## INTRODUCTION

1.      Danielle Johnson works for the State of Oregon Department of Environmental Quality ("DEQ"), an agency charged with protecting Oregon's air, water, and land.  When Ms. Johnson joined DEQ, she thought she would be able to pursue her career, while at the same time protecting the States's natural resources.

2.      But, since at least the summer of 2020, DEQ and its leaders have radically transformed the agency from one primarily focused on environmental quality, to one that now exists in large measure to advance an unrelated social agenda sometimes known as "Diversity, Equity and Inclusion" or "DEI."  In so doing, DEQ has established an illegal racial spoils system that uses taxpayer money to dole out employment, promotional opportunities, and other benefits on the basis of race.

3.      DEQ reinforces its discriminatory regime by continually reminding employees that, in DEQ's view, their value and merit are tied up with immutable characteristics, such as their race.  And, lest there be any doubt, DEQ makes one hundred percent clear that, in its view, not all races are equal: some carry indelible moral stains; members of some are unable to take credit for their accomplishments because they are the result of unearned "privilege;" and some have voices that are not worth listening to because they do not share the alleged "lived experiences" of favored groups.

4.      These and many other messages have created a seriously hostile work environment, not only for persons like Ms. Johnson who are members of racially disfavored groups, but also (ironically) for the very groups DEQ pretends it is helping, whose members are

continually reminded that DEQ has exceptionally low expectations for their performance and capabilities.

5.     All Ms. Johnson wanted was to be allowed to do her job with integrity.  But DEQ made that impossible.  Often, and understandably, many public employees will "go along to get along" while their employers entrench illegal systems of discrimination, no matter how much they disagree in private.  But Ms. Johnson is not like most employees.  Instead, Ms. Johnson bravely took a stand against DEQ's unlawful conduct.  She spoke up: vocally opposing DEQ's use of race-based preferences in hiring and promotion.

6.     She did so because she believes racial discrimination is wrong and illegal.

7.     Rather than taking her views to heart, DEQ again showed its true colors by retaliating against her.  DEQ publicly branded Ms. Johnson as a "racist" in company-wide communications, it demoted her, it cut her pay, and it subjected her to a months-long sham "investigation" for allegedly "doing harm" to racial minorities when she explained that DEQ was violating the law.

8.     DEQ must be held to account for its illegal conduct in violation of the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Chapter 659A of the Oregon Revised Statutes.

## PARTIES

9.     Danielle Johnson is a resident of Oregon and has been employed by DEQ as a Procurement and Contract Specialist since the fall of 2018.

10.     Defendant DEQ is a public agency of the State of Oregon.  DEQ is Ms. Johnson's employer.

11.     Defendant Leah Feldon is the Director of DEQ.  Ms. Feldon is the highest level executive of the agency and her decisions and actions are the policies and actions of DEQ.  Ms. Feldon assumed the role of Director in or around September 2022.  Prior to that time, she was the Deputy Director of DEQ, the second highest level executive of the agency.  She is sued in both her official and individual capacities.

12.     Defendant Richard Whitman formerly was Director of DEQ.  Mr. Whitman left DEQ in or around September 2022.  In his former position, Mr. Whitman was the highest level executive of the agency and his decisions and actions were and are the policies and actions of DEQ.  He is sued in his individual capacity.

13.     Defendant Penny Robertson is Human Resources Manager for DEQ.  As the head of DEQ's Human Resources Department, Defendant Robertson's acts and decisions are the official policies of DEQ.  She is sued in both her official and individual capacities.

14.     All Defendants were acting under color of state law at all time relevant hereto.  All Defendants are "persons" for purposes of 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

15.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 & 1988 and 28 U.S.C. § 2201 for deprivations of Plaintiff's rights secured by the First and Fourteenth Amendments to the United States Constitution.

16.     This action also arises under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e, *et seq*., 42 U.S.C. § 1981, and Or. Rev. Stat. Chapter 659A.

17.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343, and 42 U.S.C. § 2000e-5(f)(3).  The Court has supplemental jurisdiction over

Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the same transactions and occurrences that form the basis of the federal claims also form the basis of the state law claims.

18.     Plaintiff complied with all pre-suit requirements under Oregon law with respect to her state law claims.  On December 5, 2023, Ms. Johnson filed a notice of claim with the State of Oregon Department of Administrative Services detailing the facts underlying her state law causes of action.  Exhib. 1 (Notice of Claim Pursuant to Oreg. Rev. Stat. 30.275).  Accordingly, Ms. Johnson exhausted all pre-requisites to suit under Oregon state law.

19.     Venue is appropriate in this district under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.  On information and belief, venue is also appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the state of Oregon and of this district.  Venue is appropriate in the Portland Division of this Court because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in Multnomah County.  *See* D. Oreg. LR 3-2.

## STATEMENT OF FACTS

### Plaintiff's Employment

20.     The world would be a better place with more public employees like Danielle Johnson.  Not only is Ms. Johnson highly proficient and effective in her job, but she also brings a commitment to serving the public that is far too rare in government these days.

21.     Ms. Johnson holds a Master of Business Administration degree and several advanced certifications in the field of public procurement and contract administration.

22.    She began her tenure with DEQ on October 15, 2018 when she was hired as a Procurement & Contract Specialist 3, an "advanced professional level" position.  *See* Exhib. 2 (Oregon Dep't of Admin. Svs. Job Profile Specification) at 1; *see also* Exhib. 3 (2018.09.19 Offer Letter).  Ms. Johnson's duties consisted of "develop[ing], negotiat[ing], enter[ing] into and administer[ing] complex or high-risk contracts . . ."  Exhib. 2 at 1.  She is posted in the Land Quality Division, Environmental Cleanup and Emergency Response Program, operating out of DEQ's Portland, Oregon headquarters.  In that role she is responsible for procuring and managing high-stakes and high-value agreements with private contractors to clean up toxic and other contaminated waste sites.

23.    While Ms. Johnson's job duties do not include monitoring DEQ for violations of the United States Constitution, federal anti-discrimination laws, or other laws, she has spoken up as a citizen on these matters of public concern, and others.

24.    While Ms. Johnson's job duties do not include opposing DEQ's discrimination in hiring, promotions and other human resources functions, she has spoken up as a citizen on these matters of public concern, and others.

25.    While Ms. Johnson's job duties do not include speaking up in opposition to her government employer's creation of a hostile work environment, she has done so as a citizen on this matter of public concern, and others.

26.    Ms. Johnson is not employed in a role in which she sets policy for DEQ or is expected to manage public messaging on behalf of the agency.

27.    Ms. Johnson is not employed in a role in which she has regular, frequent contact with members of the public.

28.     Ms. Johnson's job performance with DEQ has been exemplary.  She has won
numerous accolades for outstanding service and has earned invariably stellar reviews during her
career.  (As noted below, however, as part of Defendants' retaliation against Ms. Johnson for
engaging in protected speech, she has recently been denied written performance reviews).

29.     For one example of her outstanding performance: unlike those of other
Procurement & Contract Specialists, many of the agreements Ms. Johnson negotiates and enters
into with contractors are not required to go through "legal sufficiency review" by the State of
Oregon Department of Justice.  Ms. Johnson alone has been granted an exemption from this
requirement because her work product is invariably superior.  By qualifying for this exemption,
Ms. Johnson has greatly enhanced efficiency in the contract formation process, to the benefit of
Oregon taxpayers and DEQ.

30.     Ms. Johnson aspires to advance in her career with DEQ.  There are positions
within DEQ that offer additional compensation and, in turn, opportunities for further
advancement.

31.     At the outset of Ms. Johnson's career, DEQ and its leaders groomed her for
promotion.  For example, she was initially invited to attend training and strategy sessions, and
was included on email distribution lists that were formally open only to higher-level managers.

32.     DEQ also promoted Ms. Johnson to the role of Lead Worker for her team.
Though not a formal change in civil service job classification, this promotion included real
increases in responsibility and visibility with higher-level managers, an obviously important
factor for Ms. Johnson's promotional opportunities.  Indeed, employees in a Lead Worker role

generally have a significant advantage when being considered for promotions to the Program

Manager level. In addition, the Lead Worker role came with a five percent pay increase.

33.    Through these and other acts, DEQ has signaled that it deemed Ms. Johnson to be

an outstanding candidate, and that her promotion through the ranks was virtually inevitable.

34.    All of this changed, however, after Ms. Johnson voiced her opposition to DEQ's

increasingly discriminatory and illegal practices. To retaliate against Ms. Johnson for exercising

her free speech rights, as detailed below, Defendants stripped her of her Lead Worker promotion,

cut her pay, destroyed her professional reputation, and subjected her to a sham "investigation"

that lasted more than six months. Defendants also removed her from supervisory-management

email lists, disinvited her to meetings that would have been important for career advancement,

and excluded her from interview panels. Because of Defendants' retaliation, Ms. Johnson has

lost promotional opportunities and future enhanced earnings opportunities that would otherwise

be wide open to her and for which she is more than qualified.

### DEQ's Transformation from an Institution Devoted to Public Service to a Hotbed of "Social Justice" Activism and Illegal Race-Based Employment Practices

35.    DEQ is a department of the executive-administrative branch of the state

government of Oregon. Or. Rev. Stat. 468.030. It is managed under the authority of the

Environmental Quality Commission, whose members are appointed by the Governor. *See id.*;

*see also* Or. Rev. Stat. 468.010. DEQ's is charged with implementing Oregon's laws related to

the purity and quality of air, water, and land in the state. Or. Rev. Stat. 468.035.

36.    For some years, but with notably increased intensity beginning in the summer of

2020, DEQ's leadership has transformed the agency into one that exists in large measure to dole

out government jobs and other benefits on the basis of race.

37.     Under policies adopted by Defendant Whitman, re-adopted by Defendant Feldon, and approved by the Environmental Quality Commission, DEQ officially rejects "[a] policy of equal employment opportunity," because providing equal opportunities to individuals regardless of their race or other immutable characteristics allegedly will fail to "result in a workforce that includes appropriate representation of women, minorities, and people with disabilities in all job classifications."  Exhib. 4 at 42 (DEQ Policy: Affirmative Action and Equal Opportunity, attached as App'x to DEQ Affirmative Action Plan July 1, 2019 to June 30, 2021).  It is unclear what DEQ means by "appropriate representation," other than that it believes the statistical representation of various groups across job classifications that reflects a process in which everyone has equal employment opportunities is somehow *inappropriate*.[1]

38.     More to the point, DEQ is not shy in expressing its goal that, regardless of the distribution that results from a process of equal opportunity, DEQ will seek to hire and promote a workforce that "reflects the demographics of Oregon."  *Id.*  These efforts at racial balancing took on increased urgency beginning in 2020.

39.     Puzzlingly, however, DEQ's own documents refute the view that DEQ's practices prior to 2020 resulted in statistically meaningful differences in hiring across races, with the sole exception that DEQ's data appears to show a significant bias *against white applicants*.  For example, DEQ's 2019 to 2021 Affirmative Action Plan includes statistics showing that for each

---

[1]     To be sure, Defendants' policies also pay lip service to the idea that DEQ is "committed to a policy and practice of Equal Employment Opportunity."  Exhib. 4 at 42.  This statement is false.  As outlined in the main text, DEQ's practices are shot through with race-based preferences, segregated work spaces, and cultural norms that single out certain racial groups for opprobrium, all of which unmistakably describe an employer who is anything but "committed to equal opportunity."  DEQ may well be an employer committed to equality of *outcome*, but this is not the same thing.

demographic group, with one exception, the difference between the group's representation in DEQ's candidate pool and representation among those actually hired by DEQ was minimal, ranging in 2017 and 2018 from 0.2% for veterans to about 4% for Hispanic/Latino applicants. The outlier was *white* applicants whose representation among those hired by DEQ was almost 10% less than in the applicant pool. *Id.* at 9.

40.    Nevertheless, despite DEQ's data showing a potential anti-white bias, Defendants have for years significantly ratcheted up their efforts to ensure that jobs and promotions were directed more and more forcefully away from persons categorized as white, to persons categorized as non-white.

41.    For example, in September 2020, Defendant Whitman announced via agency-wide emails that DEQ would increase its focus on the alleged responsibility to "address historic inequities and injustices" in society writ large through hiring and promotional practices that reduced white employee representation in favor of non-white representation.

42.    As part of those efforts, DEQ also started to segregate employees on the basis of race.  For example, Mr. Whitman announced that employees would be given an hour per week, "on work time" to enter into so-called "safe spaces," set up exclusively for non-white employees.

43.    For those excluded from these racially segregated spaces, the message was unmistakable.  Not only was DEQ expressing hostility and disfavor toward excluded employees because of their race, but since "DEI" was now the watchword for the agency generally, those on the outside looking in would henceforth be excluded from meetings during which topics of obvious importance to agency leadership (and hence to any given employee's chances for promotion) would be discussed.

44.     Around the same time, DEQ began a series of engagements with an outside DEI consulting firm called "Engage to Change."  Initially, the firm was charged with facilitating so-called "anti-racist" training, and subsequently to develop human resources policies and other policies for adoption by DEQ.  Indeed, DEQ has recently re-affirmed (as it has time and again over the past several years) that DEQ's human resources policies and practices are largely based on Engage to Change's work product.

45.     Like DEQ before it, Engage to Change has explicitly rejected policies of "treating individuals as equally as possible, without regard to race, culture, or ethnicity," Exhib. 5 at 129 (Equity Based Organizational Assessment for Oregon DEQ), as well as policies that are aimed at "comply[ing] with federal and state laws," *id.* at 9.  Engage to Change has flatly asserted that notwithstanding their illegality, DEQ's race-based human resource policies should be continued due to their alleged "anti-oppression" and "equity" effects.  *Id.*  In other words, DEQ and its contractor Engage to Change have conceded that their conduct constitutes unlawful discrimination, but they nevertheless intend to continue anyway, because, in their view, federal and state laws do not comport with their vision of social justice.

46.     This is not the only time Defendants and their spokespeople have acknowledged the illegality of their conduct.  As noted below, at a July 11, 2023 meeting, when Ms. Johnson asked whether the policies being promoted by DEQ and Engage to Change were unlawful, Defendants made no effort to defend the legality of their practices, and simply stated that the Constitution and federal and state laws against employment discrimination were "unjust."

47.     Moreover, starting in approximately 2020, DEQ began instructing staff, first in a trickle of communications, and then in a torrent, that their job responsibilities now included a

duty to "advance" DEI goals, including, most fundamentally, the goal of decreasing the proportion of white employment and increasing the proportion of non-white employment.

48.     DEQ instructed its employees that, whenever an opportunity presented itself, they were expected to advance the interests of non-white applicants and employees at the expense of anyone who had "experienced white privilege," meaning anyone categorized as white.

49.     So, to take an obvious example, if a DEQ employee found herself on a hiring panel and was considering a non-white and a white applicant, she was expected to give a preference to the non-white applicant, whether or not his or her experience, training, and talents made him or her a superior candidate for the job.  After all, under the logic of DEI, the white applicant could not take credit for any of his or her accomplishments, as they were attributable to unearned "white privilege" anyway.

50.     To take a less obvious example, DEQ employees are required to "elevate" non-white employees in terms of mentorship, recognition at staff meetings, and other "soft-HR" items.  In other words, if a DEQ employee was determining whether to spend time mentoring a white employee or a non-white employee, she would be required to choose to mentor the non-white employee, regardless of her assessment of the relative needs of the employees for mentorship, their underlying fit for the position, the likelihood that mentorship would redound to enhanced efficiency and service to the citizens of Oregon, or any other non-race-based consideration.

51.     For another example, DEQ instructed its employees to "de-center" the voices of white employees and to "center voices of color."  In other words, if a meeting were held at which both white and non-white employees were present, DEQ required that the non-white employees

be permitted to speak, and that their views be accepted as valid, while the views of white

employees were to be treated with skepticism or dismissiveness.

52.     Lest there be any doubt, DEQ leadership, including Defendants Whitman, Feldon,

and Robertson, repeatedly made clear that these instructions were serious, and not to be taken

lightly.  Among many other examples, in emails to the entire agency, Mr. Whitman emphasized

these DEI-oriented instructions were "work that *all* staff will be engaged in."

53.     DEQ's human resources department under the leadership of Defendant Robertson

also made discrete changes in hiring and promotional procedures with the explicit intention of

"elevating" non-white applicants and promotion-seekers.

54.     To take one example, in or around September 2022, Defendant Robertson made

significant changes to the way DEQ used hiring panels to evaluate applicants.  Prior to that time,

DEQ gave primary responsibility for hiring decisions to the people in the agency most

knowledgeable about the requirements of the job being filled.  For example, if a position for a

procurement specialist came open, the hiring panel would include incumbents in more senior

positions in the same department.  Those incumbents would of course be well positioned to

determine the day-to-day needs of the department, and whether any particular job applicant's

knowledge, skills, and abilities were a good fit for the job.  Hiring panel members would have

access to an applicant's resume and other job application materials.

55.     This all changed in September 2022 when, purportedly to "reduce bias" and

increase "equity," insiders in the best position to know the agency's needs (and hence the needs

of Oregon's citizens) were suddenly cut out of the process, and relegated to simply reading a

series of pre-determined questions during a perfunctory interview, all while being denied access to application materials or other information germane to the hiring decision.

56.    On information and belief, this change was taken specifically so that hiring decisions could be made by human resources employees under the supervision of Defendant Robertson, with the intention that those decisions could more easily be made in a way that would reward favored racial groups, at the expense of disfavored groups.

57.    On information and belief, all of the foregoing acts have been directed and approved personally by Defendant Whitman or Defendant Feldon during their respective tenures as Executive Director.  Each represents the official policy of DEQ.

**To Support its System of Discriminatory Employment Practices, DEQ Creates a Hostile Work Environment Targeting Members of Non-Favored Races with Almost Continual Insults, Stereotypes, and Claims of Moral Inferiority**

58.    In addition to systematically "uplifting" members of certain races in the competition for jobs and promotions, while downgrading the career trajectory of members of other races, DEQ also ratcheted up a campaign to create a brave new cultural world in the DEQ workplace—one that specifically targeted persons of disfavored groups with almost continual criticism and negative stereotyping, while purporting (but utterly failing) to support the dignity of favored groups.  These efforts created a racially hostile work environment.

**Written Materials**

59.    One way that DEQ created a hostile environment was through written materials stating offensive racialized opinions as if they were settled fact.

60.    For example, DEQ assigned employees various reading materials that ascribed highly pejorative stereotypical character attributes and behaviors to "whiteness" such as:

a.      ingratitude; Exhib. 6 at 1 (Okun, T. <u>White Supremacy Culture</u>) (white

attributes include failing to "express [appreciation] for the work that others

are doing");

b.      talking behind the backs of other employees; *id* (asserting as a white trait:

"talk[ing] to others about the inadequacies of a person or their work

without ever talking directly to them.");

c.      habitually garnering "little or no learning from mistakes;" *id*. at 2;

d.      generally failing to "be inclusive, [to] encourage . . . thoughtful decision-

making, to think long-term [or] to consider consequences;" *id.* at 2;

e.      being willing to "sacrifice[e]" other persons "to more quickly win

victories for white people," *id.*;

f.      "defensiveness," *id.* at 3;

61.     DEQ is so deeply scornful of certain of its employees that it saw fit to endorse the

statement, "whiteness is a death sentence."  Exhib. 7 at 5 (Okun, T. <u>White Supremacy Culture –

Still Here</u>).

62.     For another example, in June and July 2023, DEQ disseminated an Organizational

Assessment ("OA") created by Engage to Change that all employees were required to read,

absorb, and put into practice.

63.     Like the messaging that preceded it, the OA primarily highlighted allegations that

"whiteness" had infected DEQ and was responsible for allegedly inappropriate outcomes in

hiring and promotions.  *See, e.g.*, Exhib. 5 at 9, 103-104 (repeating the claim that there are

"fifteen characteristics of 'whiteness,'" some of which are outlined above at ¶ 60).

64.    The OA is replete with statements that denigrate some employees on the basis of their race.  For example, the OA asserts that "[w]hite folks are unconsciously invested in racism." *Id.* at 25.

65.    The OA also specifically promotes the notion of "white fragility," that when white people are told that unequal outcomes are invariably the result of "racism," the

> racial stress becomes intolerable . . . , triggering a range of defensive moves. These moves include the outward display of emotions such as anger, fear, and guilt, and behaviors such as argumentation, silence, and leaving the stress-inducing situation. These behaviors, in turn, function to reinstate white racial equilibrium.

*Id.* at 155.

66.    The OA also set forth a number of "underlying beliefs" allegedly held by white people, including:

      a.    "My unexamined perspective is equal to people of color's,"

      b.    "As a white person I know the best way to challenge racism,"

      c.    "If I can't see it, it isn't legitimate," and

      d.    "I am superior."

*Id.* at 23.

67.    Leaving aside the incoherence of some of these purported "white" beliefs, the message of these kinds of ascriptions is unmistakable: white employees suffer from defects not only of character and morals, but also of intellect and understanding.

68.    Defendants Whitman, Feldon, and Robertson have specifically adopted Engage to Change's assertions in the OA about "whiteness" and other topics as the official view and policy of DEQ.

69.    All of DEQ's written materials on "anti-racism" were explicitly meant to be absorbed and adopted by DEQ employees to further the goals of advancing so-called "equity." DEQ did not circulate these materials lightly—it did so in a specific effort to change the way employees thought (especially by promoting negative ideas about "whiteness") and it did so in a specific effort to change the way employees treated each other (especially by treating fellow employees who happen to be white worse than fellow employees who happen to be non-white).[2]

70.    Materials like these have been circulated to DEQ employees on an almost continual basis from at least the summer of 2020 to the present.  DEQ's messaging on race has been pervasive and has severely affected the workplace for individuals like Ms. Johnson.

**Racialized Trainings**

71.    Aside from its nearly continual stereotype-laden messaging to employees, DEQ also created a hostile work environment through mandatory trainings that aggressively promote concepts such as "white privilege" and the collective and intergenerational guilt that white employees like Ms. Johnson purportedly bear for disparate outcomes by race in society writ large.

---

[2]    Bizarrely, DEQ's messaging also assigned attributes to "whiteness" that one would think were positive, especially in the context of running a public institution charged with delivering results to the citizens of Oregon.  For example, DEQ asserted that it was an aspect of "white culture" to focus on objective data and "things that can be measured," Exhib. 6 at 3, as opposed to anecdotes and feelings.  For another example, DEQ asserted that it was "white" to focus on the "written word," *id*. at 4, and to value "individualism," *id*. at 7.  Although intended by DEQ to be an indictment of "whiteness," these stereotypes tend more to denigrate the groups that DEQ pretends to be helping, underscoring just how little DEQ thinks of non-white persons (i.e., DEQ believes non-white persons do not focus on measurable outcomes and prefer to make decisions based on anecdotes and feelings, etc.).

72.    For one example, in October 2020, Ms. Johnson and other DEQ employees were required to attend a so-called "anti-racism" training by Engage to Change.

73.    During the training, facilitators repeatedly blamed societal inequities on "structural racism," and similar negative tropes detailed *supra* at ¶¶ 60-66.   They further repeatedly instructed DEQ employees to "elevate," or give heightened credence to, the voices of non-white employees.

74.    For another example, in July 2023, DEQ employees were required to attend another session by Engage to Change.  The July 2023 Engage to Change sessions were replete with derogatory statements concerning "whiteness," and other hostile messaging.  Details of the July 2023 Engage to Change session are provided below in ¶¶ 98-117.

75.    Under DEQ's official policies, Ms. Johnson and other employees are required to regularly attend "anti-racism" trainings such as these.

76.    Notably, in sharp contrast to the heavy emphasis placed on training DEQ employees to absorb DEI and "anti-racist" concepts (many of which are both racially hostile and counterproductive to an environment of equal opportunity), DEQ provides no training whatsoever on employee free speech protections, including training for supervisory and managerial employees on the requirements of the First Amendment or other applicable law.

**The Effect of DEQ's Trainings and Racially-Charged Communications Is to Create a Hostile Work Environment for Ms. Johnson**

77.    DEQ's trainings, representations, reading materials and other communications were not meant to be (nor were they taken as) mere academic exercises.  The representations outlined above were meant to be internalized by all DEQ employees, and acted upon in the day-

to-day functioning of DEQ.  Indeed, DEQ and its consultants have repeatedly emphasized that DEQ employees are to hold white colleagues in their midst "accountable."

78.    In other words, DEQ employees are required, as part of their job, to adopt views such as that to be white is to hoard power, or that to be white is to disdain the contributions of non-white people, and many other derogatory views.  Employees are also expected to struggle against free-floating "whiteness" in the workplace, which of course means employees are required by DEQ to treat white employees differently—more harshly than they would otherwise, with greater skepticism than they would otherwise, etc.

79.    Ms. Johnson, as she was required to do, read and absorbed the representations and trainings outlined above, as well as many others.

80.    She was aware that other DEQ employees also read and absorbed those representations and trainings.  She was aware that, like her, other employees were being instructed by their employer to view "whiteness" in a negative light, and to treat white employees more harshly as a result.

81.    Ms. Johnson was aware that, like her, other white DEQ employees were being instructed to "take sides" as "allies" against non-"ally" white employees.

82.    DEQ's instructions ran counter to Ms. Johnson's personal ethics, which include a sense of responsibility to treat all persons equally, as opposed to "allying" with some people and "opposing" others, especially when the allyship/opposition dichotomy turns on the color of a person's skin.

83.    DEQ employees, including Ms. Johnson, knew that they could face disciplinary consequences for failing to internalize and act on DEQ's materials and communications.

84.     DEQ employees, including Ms. Johnson, knew that they would likely be called "racist," if they questioned any of DEQ's representations or training materials and that such a label would carry serious negative consequences for their employment.

85.     DEQ employees knew that the official policy of DEQ was that "whiteness" consisted in a number of negative traits; that, in DEQ's view, this was not a metaphor or opinion, but was a fact; that, in DEQ's view, these positions were not up for debate; that, in DEQ's view, even the impulse to question the tenets of so-called "anti-racism" was itself "racist" and would brand the questioner as unfit to serve the people of Oregon as a government servant.

86.     DEQ's efforts bore fruit:  it is commonplace within DEQ to hear employees, including managers and supervisors, make derogatory statements about white people.

87.     For example, it is commonplace for DEQ employees, including managers and supervisors, to express the view that white employees like Ms. Johnson cannot take credit for their accomplishments because they are the result of unearned "privilege."

88.     It is commonplace for DEQ employees, including managers and supervisors, to express the view that white employees' "voices" are not worth listening to and the non-white "voices" are the only ones that can express truth.

89.     It is commonplace within DEQ to hear employees, including managers and supervisors, make assertions such as that only white people can be racist, and that it is impossible to be racist against white people.

90.     It is commonplace within DEQ for employees, including managers and supervisors, to express the view that discrimination against white people is legitimate.

91.    Not only has DEQ done nothing to stop its employees from making these and other racially hostile comments, but DEQ has actively encouraged these acts by policy and practice.

92.    Ms. Johnson has suffered significant mental and personal stress based on the fact that she was being described, as a white-identified employee, in highly negative and false terms by her employer and co-workers.

93.    Ms. Johnson has suffered significant mental and personal stress based on the fact that she knew her employer was training other employees to view her in a negative light, and to treat her differently because of the color of her skin.

94.    DEQ's trainings, communications, reading materials, and other statements have created a culture of suspicion and distrust by creating an atmosphere where DEQ has officially blessed the idea that individuals of certain races have specific attributes, and that failure to agree and to promote those views could result in accusations of racism and to discipline.

95.    Indeed, when Ms. Johnson raised objections to some of DEQ's materials, she was swiftly and strongly retaliated against, as outlined below.  Accordingly, the fears of Ms. Johnson and other DEQ employees were well-founded, and her mental and personal stress has been an entirely justifiable reaction to DEQ's misconduct.

96.    Absent relief from this Court, these racially-discriminatory communications and trainings will continue.  DEQ's environment will be continually more and more hostile to certain groups of employees unless this Court intervenes.

**<u>Ms. Johnson Speaks Up in Opposition to DEQ's Racial Discrimination, Only to Face Retaliation Meant to Silence Her and to Stifle Discussion of a Matter of Utmost Public Concern</u>**

97.     Although DEQ has created an intimidating, hostile, and stifling atmosphere, Ms. Johnson is an extraordinarily brave and principled public servant.  Ms. Johnson has found the courage to speak up in opposition to DEQ's illegal conduct with the hope that the agency might change course.  Rather than take her views to heart, however, DEQ retaliated against Ms. Johnson for her protected speech.

98.     As noted above, as a key part of its messaging and policy development efforts, DEQ enlisted Engage to Change to produce an Organizational Assessment.  The written OA was distributed to employees in June 2023.

99.     In addition to being required to read the OA, all DEQ employees were also required to attend so-called "informative sessions" in July 2023, during which Engage to Change re-affirmed and elaborated on the racially-defamatory propositions set forth in the OA, and during which Engage to Change promoted DEQ's racially discriminatory policies directing jobs, promotions and other benefits to individuals on the basis of their race.

100.    Defendant Feldon specifically instructed all DEQ employees, including Plaintiff, to attend an informative session.  Defendant Feldon also specifically endorsed the Organizational Assessment, and communicated her endorsement to all DEQ employees.  Defendant Feldon's actions gave official imprimatur to the statements set forth in the OA.

101.    On July 11, 2023, as she was required to do, Ms. Johnson attended a meeting during which the OA was presented and discussed. The meeting was held via video

teleconference, and was attended by approximately 150 employees, including high-level managers.

102.    During the meeting, representatives from Engage to Change repeated many of the same discriminatory tropes set forth in the OA and other DEQ communications.  For example, a facilitator asserted that "folks of color know whiteness better than white folks know whiteness." Another facilitator repeated that acting frantically and being out of control was "tightly connected to whiteness."

103.    Facilitators also asserted that white people are incapable of listening to others. And a facilitator specifically "called out" "white folks" as morally inferior with respect to being able to judge whether their language was "harmful."

104.    A facilitator also asserted that non-white employees should be paid additional amounts to "compensate" for doing the "invisible labor" of *being* non-white, which (in his view) necessarily implies spending time and effort to counter and "dismantle" whiteness in the workplace.  In other words, Engage to Change stated the policy position, adopted by DEQ, that there should be a racial wage premium paid to non-white employees.

105.    High-level managers at DEQ, including Defendant Robertson, were present at the meeting, but did not speak up to counter the racial aspersions being cast by Engage to Change, or to enforce DEQ's compliance with Title VII and other relevant laws.

106.    Although there were undoubtedly many participants at the meeting disturbed by the messages being promoted by DEQ and Engage to Change, the pressure to keep quiet was intense.  Nevertheless, despite the risks, Ms. Johnson could not sit quietly by.

107.    In a non-combative and respectful way, Ms. Johnson asked whether it was "legal to deliberately treat people differently based on their race or any other protected class status in employment decisions?"  She also asked if the "anti-racism work" promoted by DEQ and Engage to Change required "ignoring some laws."

108.    Defendants did not immediately respond, but turned the question back on Ms. Johnson.  Ms. Johnson then stated (correctly) that she did not believe it was legal for the government to treat people differently based on their race.  She further noted that, to the extent that DEQ might seek to justify its discrimination on the basis that it would "make up for" past discrimination by the ancestors of (some) current white employees against the ancestors of (some) current non-white employees, the law did not support DEQ's position.

109.    To the contrary, Ms. Johnson placed the focus where it belongs, stating, "if someone is actively being discriminated against based on their protected class status, there are processes, procedures they can go through to try to get justice at an individual level."

110.    These are reasonable positions to take.  More than that, Ms. Johnson was absolutely correct: it is patently unconstitutional (not to mention a violation of state and federal workplace anti-discrimination laws) for the government to make race-based employment decisions like the ones taken by DEQ and promoted by Engage to Change.

111.    But DEQ and its consultant did not like anyone raising questions about their illegal system to distribute jobs, pay, and promotions on the basis of race.

112.    Incredibly, Engage to Change's facilitator made no effort to defend the legality of DEQ's practices.  To the contrary, the only response provided to Ms. Johnson was to assert that

the "laws"—meaning the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, and other anti-discrimination laws—were not "just."

113.    In response, Ms. Johnson reasonably asserted that, in her view, if DEQ or its leaders were of the opinion that the Constitution and other laws were unjust, the correct (and legal) response would be to seek to amend the Constitution and change the laws, not to deliberately flout them in derogation of the public trust.

114.    Rather than take Ms. Johnson's inquiry and statements at face value, Engage to Change's facilitator first accused Ms. Johnson of exhibiting "resistance"—one of the alleged characteristics of "whiteness" disdained by DEQ.  The facilitator then directed a personal attack at Ms. Johnson, belittling her, and even suggesting that other participants in the meeting should feel enraged or harmed by her statements.  The facilitator then asserted that Ms. Johnson's (extremely mild) discourse caused "trauma" to non-white participants.

115.    The facilitator also created race-segregated breakout rooms for further discussion, and explicitly forbade white employees from joining any of these breakout rooms.  The facilitator audibly laughed at the idea that any white employees might "feel excluded," by this move.

116.    The conversation then turned to a discussion of how DEQ could best prevent employees from speaking about the topic of DEQ's race-based employment practices.  Among other things, several facilitators discussed using a technique of "interrupting" anyone who raised issues like the ones Ms. Johnson asserted.  There was also ominous discussion of how DEQ's managerial leadership should react to employees like Ms. Johnson in order to set an example that would deter further communication, lest it "harm" listeners.

117.    Defendant Robertson explicitly adopted and reiterated all of the statements made by the facilitators from Engage to Change.  Defendant Robertson further stated that, in her view, having a discussion about the legality of DEQ's conduct caused "harm," especially to her "HR team."

118.    The following day, Ms. Johnson's direct supervisor told her that he "heard from several people that there was a pretty intense exchange that you were a part of [during the July 11, 2023 meeting]."  Exhib. 8 at 5-6 (2023.07.12 email from N. Fairchild to D. Johnson).

119.    Ms. Johnson informed her supervisor that she had questioned whether DEQ's race-preferences were legal and noted that,

> as a management services employee, my understanding is that I am held to a higher standard of ethics.  When I see something that appears to be advocating for illegal conduct, I feel compelled to ask about it and bring it to others' attention so that it can be explored and hopefully resolved.  Ideally, we would all be reassured that DEQ intends to follow the letter of the law, even if that doesn't result in racial proportional representation because, as the Supreme Court stated in the SFFA case, "[O]utright racial balancing" is "patently unconstitutional."

*Id.* at 5 (2023.07.12 email from D. Johnson to N. Fairchild).

120.    In further emails with her supervisor during the period of July 13, 2023 to July 14, 2023, Ms. Johnson noted that DEQ's racial "equity" goal, which aims at "racially proportional representation relative to society as a whole," without regard to fitness for employment, could be advanced only through "illegal, discriminatory practices."  Ms. Johnson cogently noted that "[t]he Constitution requires equal opportunity; it does not require or expect equitable outcomes. And it does not permit equitable outcomes if achievement of such would require violation of the law."  *Id*. at 1-4.

121.    Ms. Johnson's statements concern a matter of utmost public concern.  The public obviously has a vital interest in the misuse of taxpayer money and the power and authority of government to create an illegal racial spoils system.  The public obviously has a vital interest in the use of government power to promote racially-divisive and -hostile opinions, especially when presented as irrefutable fact.

122.    Ms. Johnson's statements also constitute opposition to unlawful discrimination protected by 42 U.S.C. § 2000e-3(a) and Or. Rev. Stat. 659A.030(1)(f).

123.    Ms. Johnson's statements also constitute reports of potential illegal conduct protected by Or. Rev. Stat. 659A.199.

124.    In response to Ms. Johnson's protected expression, Defendants Feldon and Robertson undertook to retaliate against Ms. Johnson.

125.    First, in a July 17, 2023 email to all of the more than 700 employees of DEQ, Defendant Feldon referred to Ms. Johnson's discourse during the OA meeting as a "public incident[]" that demonstrated an alleged continuing "racis[t]" culture within the organization. Exhib. 9 (2023.07.17 email from D. Feldon to All DEQ Staff).  According to Defendant Feldon, by raising issues around the legality of DEQ's practices, Ms. Johnson engaged in "aggressive resistance," and uttered "hurtful comments," that were tantamount "to a racist . . . diatribe." Defendant Feldon "apologized" to the alleged victims of Ms. Johnson's speech.  *Id.* ("For those who were harmed, I am sorry.").

126.    On information and belief, Defendant Feldon knew of the true import and meaning of Ms. Johnson's words.  Defendant Feldon knew that the true content of Ms. Johnson's expression was resistance to illegal employment discrimination, and questions about the legality

of DEQ's practices.  Defendant Feldon's statements in her July 17, 2023 email concerning Ms. Johnson were knowingly false.

127.    Within days of Defendant Feldon's email, on July 31, 2023, Defendant Robertson demoted Ms. Johnson, stripping her of her Lead Worker position.  The demotion was in retaliation for Ms. Johnson's expression at the OA meeting and in follow-up communications as detailed above.

128.    Defendant Robertson also cut Ms. Johnson's pay by five percent.  The pay cut was in retaliation for Ms. Johnson's expression at the OA meeting and in follow-up communications as detailed above.

129.    Defendant Robertson also initiated a so-called "investigation" into whether Ms. Johnson had caused "harm" when she exercised her free speech rights during the OA presentation.

130.    The investigation was a sham, and was intended solely to retaliate against Ms. Johnson for her protected speech.

131.    As an additional act of retaliation by Defendants, Ms. Johnson's supervisor has refused to provide her with formal performance reviews, in violation of DEQ policies and practices.

132.    On information and belief, Defendants Robertson and Feldon jointly came to the decision to demote Ms. Johnson.

133.    On information and belief, Defendants Robertson and Feldon jointly came to the decision to cut Ms. Johnson's pay.

134.    On information and belief, Defendants Robertson and Feldon jointly came to the decision to subject Ms. Johnson to a sham investigation.

135.    On information and belief Defendants Robertson and Feldon jointly came to the decision to deny Ms. Johnson formal performance reviews.

136.    Being effectively labeled a "racist" in a company-wide email from the highest level executive in an organization would deter a person of reasonable firmness from exercising their free speech rights.

137.    Being demoted would deter a person of reasonable firmness from exercising their free speech rights.

138.    Having one's pay cut would deter a person of reasonable firmness from exercising their free speech rights.

139.    Being subjected to a sham investigation that lasts for an indeterminate amount of time—ultimately more than six months—would deter a person of reasonable firmness from exercising their free speech rights.

140.    On August 8, 2023, while the sham investigation was ongoing, Plaintiff filed an internal complaint with the Oregon Department of Administrative Services ("DAS").  The complaint stated that Defendants' conduct in response to Plaintiff's protected July 2023 speech was retaliatory, among other things.  Exhib. 10 (Aug. 8, 2023 DAS Complaint).

141.    As a result of Plaintiff's filing, Defendants and DAS combined their sham investigation into the alleged "harm" caused by Plaintiff's speech with a now-defensive investigation into Plaintiff's claim of retaliation.

142.     On February 5, 2024, DAS issued a letter detailing the results of Defendants'
investigations into both (1) the alleged "harm" caused by Plaintiff's speech and (2) Plaintiff's
complaint of retaliation.  Exhib. 11 (Feb. 5, 2024 DAS Letter).

143.      In its letter, DAS first conceded that Plaintiff's complaint "ha[d] merit," and that
Plaintiff's demotion and pay cut "constituted . . . retaliation for engaging in protected conduct
during [the] July 11, 2023 [Engage to Change] meeting."  *Id.* at 1.

144.     DAS also conceded that Plaintiff's speech during the Engage to Change meeting
"did not . . . constitute[] a violation of [DEQ's] professional workplace policy."  *Id.* at 2.
According to DAS, DEQ further agreed to restore Plaintiff to her prior position and to
"compensate [her] retroactively for the period [her] lead duties were suspended."  *Id.*

145.     While the DAS letter of February 5, 2024 appears to reflect that Ms. Johnson has
been restored to her prior position of employment and to her prior pay, it does not come close to
remedying the harms suffered by Ms. Johnson due to Defendants' retaliation.

146.     Ms. Johnson continues to suffer repercussions as a result of Defendants'
retaliatory acts, notwithstanding the February 5, 2024 DAS letter.

147.     First, the DAS letter does nothing to address the retaliatory July 17, 2023
company-wide email from Defendant Feldon which effectively labeled Plaintiff as a "racist."

148.     Nor did it address the harm to Ms. Johnson's professional reputation for being
"under investigation" for a "racist" incident for more than six months, during which time she was
demoted and suffered a pay cut.

149.     Ms. Johnson does not live and work in a vacuum.  Like anyone else, she has co-
workers and networks of other professionals with whom she interacts and on whom she relies for

career support and advancement.  Those people know that Ms. Johnson has been labeled a

"racist" and a troublemaker (indeed Defendant Feldon saw to that personally) and, whether

subtle or not, those people's assessment of Ms. Johnson (including their assessment of whether

she is in good standing with agency leadership) have been inevitably affected by the very

existence of the "investigation," not to mention the accusatory emails and other communications.

150.    Indeed, some of Ms. Johnson's co-workers have noticeably changed the way they

interact with her.  Other DEQ employees know that Ms. Johnson has been targeted by the highest

level of DEQ management.  On information and belief, some of them have taken Defendants'

representations to heart, and believe the lie that Ms. Johnson is in fact a "racist," and treat her

accordingly, with hostility and distaste.

151.    Ms. Johnson's professional network has been destroyed by Defendants'

retaliatory actions.

152.    Ms. Johnson's professional reputation and opportunities for career advancement

have been destroyed by Defendants' retaliatory actions.

153.    Moreover, upon information and belief, DEQ has not purged its files of records

related to the investigation, Ms. Johnson's (apparently now reversed) demotion and pay cut, or

the underlying events of July 11, 2023.  Accordingly, future decisions by DEQ concerning

promotions, pay, mentoring and a host of other matters will inevitably continue to be affected by

Defendants' retaliation.

154.    In addition, the fact that Ms. Johnson's time in the Lead Worker position has been

truncated by six months means that she will not enjoy the benefits of being a Lead Worker in

terms of promotional enhancement and similar items.

155.    All of this is made immeasurably worse by the fact that, in its letter, DAS, while conceding violations of Ms. Johnson's rights, bent over backwards to nevertheless minimize DEQ's culpability and to carry forward the lie that *Ms. Johnson* engaged in misconduct on July 11, 2023 (even if, as DAS conceded, not technically in violation of DEQ's professional workplace policy).

156.    First, DAS asserted that when Ms. Johnson was retaliated against for speech (which speech DAS farcically calls "conduct") critical of DEQ during the July 11, 2023 Engage to Change meeting, that retaliation amounted only to what DAS called "technical retaliation." Exhib. 11 at 1.

157.    Leaving aside that there is no such thing as a "technical" violation of the First Amendment, the implication of DAS's word choice is clear: in a classic "non-apology apology," DAS has signaled that it believes that it was justified all along and, legal technicalities aside, it was a *good thing* to demote Ms. Johnson, cut her pay, and brand her a "racist" for pointing out the illegality of DEQ's practices.

158.    DAS compounded this by asserting, against all evidence, that Defendant Feldon and the other Defendants lacked a "malicious or even retaliatory underlying motivation." *Id.* Not only that, but, according to DAS, they acted out of the noble motive of seeking to ensure "staff under [Plaintiff's] leadership wouldn't *suffer additional harm*." *Id.* (emphasis added). Once again, Defendants demonstrate that they truly believe that when Ms. Johnson pointed out the illegality of DEQ's practices, she in fact caused "harm" to other employees.

159.    Other employees are sure to get the message Defendants intend: while DEQ may have had its hand caught in the cookie jar as a "technical" legal matter, it stands behind its

retaliation, and will do it once again if other employees speak up in opposition to DEQ's illegal DEI regime.

160.    While DAS's concessions of wrongdoing by Defendants (technical or not) are binding on Defendants, DAS's findings purporting to absolve Defendants of other misconduct are not binding on anyone.

161.    Plaintiff has been harmed by Defendants' conduct.  Among other things, Plaintiff has lost income, has had her future earnings potential dramatically diminished, and has suffered emotional and psychological harm.  Moreover, plaintiff has suffered irreparable harm as a result of Defendants' conduct because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

162.    Plaintiff suffered damages in an amount to be determined at trial as a result of Defendants' conduct described herein.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### (AGAINST DEFENDANTS FELDON & ROBERTSON)

### RETALIATION
#### (FIRST AND FOURTEENTH AMENDMENTS - 42 U.S.C. § 1983)

163.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

164.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The Fourteenth Amendment incorporates the

guarantees of the First Amendment and makes them enforceable against state and local government entities.  *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997).  DEQ is one such entity.

165.    Plaintiff engaged in constitutionally protected speech and has been subjected to numerous adverse employment actions as a result.

166.    Plaintiff's speech was not pursuant to her job duties and was speech "as a citizen," for purposes of the First Amendment.

167.    Plaintiff's speech involved matters of public concern, including racial discrimination by the government, the misuse of public funds to implement illegal human resources policies, the ascription of negative characteristics to a group of individuals based purely on the color of their skin, and similar issues.

168.    Defendants subjected Plaintiff to adverse employment consequences in retaliation for Plaintiff's speech.

169.    The adverse employment consequences visited on Plaintiff would deter a person of reasonable firmness from engaging in protected speech.

170.    Based on these retaliatory acts, Defendants have violated Plaintiff's First Amendment Rights.

171.    Plaintiff has suffered and continues to suffer irreparable injury as a direct result of Defendants' retaliatory conduct.

172.    Plaintiff has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her First Amendment rights.

173.    Defendants would not be harmed by the issuance of injunctive relief prohibiting them from violating Plaintiff's constitutional rights.

174.    The public interest would be served by the issuance of injunctive relief in this matter because "upholding constitutional rights serves the public interest." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

175.    Any reasonable government official surveying the legal landscape would know that retaliating against Plaintiff for the exercise of her First Amendment rights was unconstitutional.

176.    Plaintiff's rights were clearly established at the time of Defendants' infringement.

177.    Plaintiff is entitled to an award of damages against each Defendant named in his or her individual capacity in an amount to be proven at trial.

178.    Defendants Feldon and Robertson's acts were done in reckless disregard of Plaintiff's constitutional rights because they acted with the intent to suppress Plaintiff's expression challenging their unlawful conduct.

179.    An award of compensatory or nominal damages would be insufficient to deter further acts by Defendants Feldon and Robertson in violation of Plaintiff's and other DEQ employees' constitutional rights.

180.    Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants Feldon and Robertson.

## SECOND CLAIM FOR RELIEF

### (AGAINST DEFENDANTS DEQ, FELDON & ROBERTSON)

### RETALIATION
### (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – 42 U.S.C. § 2000e-3(a))

181.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

182.    Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee for (1) opposing unlawful employment practices or (2) participating in EEOC proceedings.  Defendants retaliated against Ms. Johnson for both her opposition to DEQ's unlawful discriminatory practices, and because she participated in EEOC proceedings.

183.    Ms. Johnson opposed Defendants' unlawful employment practices when she spoke out against them during the July 11, 2023 OA meeting.

184.    Defendants subjected Plaintiff to materially adverse employment consequences in retaliation for her speech.  Among other things, Defendants demoted Plaintiff, cut her pay, labeled her as a "racist" in company-wide emails, and subjected her to a sham investigation.

185.    Defendants imposed these adverse employment consequences out of a desire to punish Plaintiff for opposing Defendants' unlawful discrimination.

186.    In addition, Plaintiff participated in prior EEOC proceedings when she filed EEOC Charge No. 551-2023-02513, which included claims of discrimination.  Exhib. 12.

187.    EEOC issued its Right to Sue Letter for Charge No. 551-2023-02513 on July 6, 2023.  Exhib. 13.  Defendants knew of Plaintiff's EEOC charge, and knew that EEOC had issued a Right to Sue Letter.

188.    Beginning on July 17, 2023, a mere eleven days after the EEOC Right to Sue

letter, Defendants embarked on a campaign of retaliation against Plaintiff.  Among other things,

Defendants demoted Plaintiff, cut her pay, branded her as a "racist" in company-wide emails,

and subjected her to a sham investigation.

189.    Defendants imposed these adverse employment consequences out of a desire to

punish Plaintiff for participating in EEOC proceedings related to charge No. 551-2023-02513.

190.    Defendants Feldon and Robertson's acts were done in reckless disregard of

Plaintiff's rights because they acted with the intent to suppress Plaintiff's expression challenging

their unlawful conduct.

191.    An award of compensatory or nominal damages would be insufficient to deter

further acts by Defendants Feldon and Robertson in violation of Plaintiff's and other DEQ

employees' rights.

192.    Accordingly, Plaintiff is entitled to an award of punitive damages against

Defendants Feldon and Robertson.

193.    Plaintiff exhausted her administrative remedies on the instant claim for relief prior

to filing this lawsuit.   In July 2023, Ms. Johnson filed a new charge of discrimination that was

assigned EEOC No. 551-2023-05187.  Exhib. 14 (EEOC Charge No. 551-2023-05187, perfected

2023.11.13).  The charge alleged, among other things, that Ms. Johnson had been retaliated

against both for opposing discrimination and for participating in a prior EEOC proceeding.  *Id.*

On November 20, 2023, EEOC issued a Right to Sue letter to Ms. Johnson.  Exhib. 15 (Notice of

Right to Sue 551-2023-05187 – EEOC).  The charge was dual-filed with the State of Oregon

Bureau of Labor & Industries – Civil Rights Division ("BOLI").  Exhib. 14.  On January 26,

2024, BOLI issued a Right to Sue letter to Ms. Johnson. Exhib. 16 (Notice of Right to Sue 551-2023-05187 – BOLI). Accordingly, Plaintiff exhausted her administrative remedies prior to bringing this lawsuit.

### THIRD CLAIM FOR RELIEF

#### (AGAINST DEFENDANTS FELDON & ROBERTSON)

### RETALIATION
### (42 U.S.C. §§ 1981 & 1983)

194.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

195.    Section 1981 protects employees from race discrimination in the employment context. ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.").

196.    The Supreme Court has held that 42 U.S.C. § 1981 applies equally to white persons, and not only to historically disadvantaged minorities. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295-96 (1976). "[T]he provision was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23, 123 S. Ct. 2411, 2430 (2003). The same substantive standards apply to a retaliation claim under § 1981 as under Title VII. *See Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003)

197.    As set forth above, ¶¶ 182-92, Defendants have retaliated against Plaintiff in violation of Title VII.  Accordingly, Defendants have also violated Section 1981.

198.    Because Defendants violated 42 U.S.C. § 1981, Plaintiff may bring a cause of action pursuant to 42 U.S.C. § 1983.  *See Yoshikawa v. Seguirant*, 74 F.4th 1042 (9th Cir. 2023).

## FOURTH CLAIM FOR RELIEF

### (AGAINST DEFENDANTS DEQ, FELDON & ROBERTSON)

### RETALIATION – OPPOSING DISCRIMINATION
### (OR. REV. STAT § 659A.030(1)(f))

199.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

200.    Pursuant to Or. Rev. Stat. 659A.030(1)(f), it is unlawful for an employer to retaliate against an employee for opposing unlawful discrimination or for participating in a BOLI proceeding.

201.    The same standards that apply to a retaliation claim under Title VII apply to Or. Rev. Stat. 659A.030(1)(f). *See Meyer v. State by & through Oregon Lottery*, 426 P.3d 89, 109 (2018).

202.    As set forth above, ¶¶ 182-85, Defendants have retaliated against Plaintiff in violation of Title VII for opposing Defendants' unlawful discrimination.  Accordingly, Defendants have also violated Or. Rev. Stat. 659A.030(1)(f) with respect to Plaintiff's opposition to discrimination.

203.    As set forth above, ¶¶ 186-89, Defendants have retaliated against Plaintiff in violation of Title VII for participating in a prior EEOC proceeding.  The prior EEOC proceeding

was identical to a prior BOLI proceeding.  *See* Exhib. 12 (dual filed charge of discrimination

with EEOC and BOLI).  Accordingly, Defendants have violated Or. Rev. Stat. 659A.030(1)(f)

with respect to Plaintiff's prior participation in the BOLI proceeding.

204.    Plaintiff complied with all pre-suit requirements under Oregon law with respect to

the instant claim.  On December 5, 2023, Ms. Johnson filed a notice of claim with the State of

Oregon Department of Administrative Services detailing the facts underlying her state law

causes of action.  Exhib. 1.  Accordingly, Ms. Johnson exhausted all pre-requisites to suit under

Oregon state law.


### FIFTH CLAIM FOR RELIEF

### (AGAINST DEFENDANTS DEQ, FELDON & ROBERTSON)

### RETALIATION – WHISTLEBLOWER
### (OR. REV. STAT § 659A.199)

205.    Plaintiff realleges and incorporates by reference the allegations set forth above as

if fully set forth herein.

206.    Plaintiff reported to Defendants conduct that Plaintiff believed was evidence of a

violation of state or federal law, rule, or regulation. Plaintiff correctly identified misconduct by

Defendants that included illegal racial discrimination.

207.    As set forth above, Defendants discriminated and retaliated against Plaintiff

because of the report made by Plaintiff.  Defendants' actions violated Or. Rev. Stat. 659A.199,

are an unlawful employment practice, and caused Plaintiff economic and noneconomic damages.

208.    Plaintiff complied with all pre-suit requirements under Oregon law with respect to

the instant claim.  On December 5, 2023, Ms. Johnson filed a notice of claim with the State of

Oregon Department of Administrative Services detailing the facts underlying her state law

causes of action.  Exhib. 1.  Accordingly, Ms. Johnson exhausted all pre-requisites to suit under

Oregon state law.

## SIXTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

## HOSTILE WORK ENVIRONMENT
### (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 – 42 U.S.C. § 2000e-2(a)(1))

209.    Title VII precludes employers from engaging in racial discrimination, including

by holding employers liable for a hostile work environment based on race.

210.    At all relevant times, Ms. Johnson was employed by Defendant DEQ.

211.    Ms. Johnson is a member of one of the classes protected by Title VII because she

is white.

212.    No employer would dare include in their official communications, reading

materials, organizational assessments, and trainings the same insulting and humiliating

statements about other races besides whites.

213.    The racially discriminatory materials promulgated by Defendants and imposed on

the workplace created severe racial discrimination against Ms. Johnson, based on her perceived

race.

214.    The racially discriminatory materials promulgated by Defendants and imposed on

the workplace created pervasive racial discrimination against Ms. Johnson, based on her

perceived race.

215.    Defendants knew of the harassing nature of the materials yet did nothing to cure the issue.

216.    Based on the facts detailed above, Ms. Johnson's workplace was permeated with discrimination, intimidation, ridicule, and insult.

217.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace created an abusive working environment, based on race.

218.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace altered the terms, conditions, and privileges of Ms. Johnson's employment.

219.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace caused Ms. Johnson to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

220.    Any reasonable person in Ms. Johnson's place would experience a hostile work environment based on race.

221.    Ms. Johnson exhausted her administrative remedies with respect to this claim for relief.  As set forth above ¶ 193, Ms. Johnson dual filed charges of discrimination with EEOC and BOLI.  Those charges included Ms. Johnson's claims for hostile work environment discrimination pursuant to Title VII.  On November 20, 2023, EEOC issued Ms. Johnson a Right to Sue letter.  On January 26, 2024, BOLI issued Ms. Johnson a Right to Sue letter. Accordingly, Ms. Johnson exhausted her administrative remedies with respect to this claim.

# SEVENTH CLAIM FOR RELIEF

### (AGAINST DEFENDANTS FELDON, WHITMAN & ROBERTSON)

## HOSTILE WORK ENVIRONMENT
### (42 U.S.C. §§ 1981 & 1983)

222.    Plaintiff realleges and incorporates by reference the allegations set forth above as if fully set forth herein.

223.    Section 1981 protects employees from racial discrimination in the employment context.  Section 1981 applies equally to white persons and not only to historically disadvantaged minorities.  *See McDonald*, 427 U.S. at 295-96; *see also Gratz*, 539 U.S. at 276 n.23.  The same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under § 1981 or Title VII.  *Manatt*, 339 F.3d at 797.

224.    Ms. Johnson is a member of one of the classes protected by Section 1981 because she is white. No employer would dare include in their official communications, reading materials, organizational assessments, and trainings the same insulting and humiliating statements about other races besides whites.

225.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace created severe racial discrimination against Ms. Johnson, based on her race.

226.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace created pervasive racial discrimination against Ms. Johnson, based on her race.

227.    Defendants knew of the harassing nature of the materials yet did nothing to cure the issue.

228.    Based on the facts detailed above, Ms. Johnson's workplace was permeated with discrimination, intimidation, ridicule, and insult.

229.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace created an abusive working environment, based on race.

230.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace altered the terms, conditions, and privileges of Ms. Johnson's employment.

231.    The racially discriminatory materials promulgated by Defendants and imposed on the workplace caused Ms. Johnson to perceive the workplace as abusive and hostile, and it was abusive and hostile objectively.

232.    Any reasonable person in Ms. Johnson's place would experience a hostile work environment based on race.

233.    Because Defendants violated 42 U.S.C. § 1981, Plaintiff may bring a cause of actions pursuant to 42 U.S.C. § 1983.  *See Yoshikawa v. Seguirant*, 74 F.4th 1042 (9th Cir. 2023).

## EIGHTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS)

### HOSTILE WORK ENVIRONMENT
### (OR. REV. STAT. 659A.030)

234.    Or. Rev. Stat § 659A.030 precludes employers from engaging in racial discrimination, including by holding employers liable for a hostile work environment based on race.

235.    The standards applicable to a claim of discrimination under § 659A.030 are identical to the standards under Title VII.  *See, e.g.*, *Ayars v. AutoZoners, LLC*, No. 3:21-CV-01537-YY, 2024 WL 167172, at *3 (D. Or. Jan. 5, 2024).

236.    As set forth above, ¶¶ 210-20, Defendants violated Title VII by creating a hostile work environment on the basis of race.  Accordingly, Defendants have also violated Or. Rev. Stat § 659A.030.

237.    Plaintiff complied with all pre-suit requirements under Oregon law with respect to the instant claim.  On December 5, 2023, Ms. Johnson filed a notice of claim with the State of Oregon Department of Administrative Services detailing the facts underlying her state law causes of action.  Exhib. 1.  Accordingly, Ms. Johnson exhausted all pre-requisites to suit under Oregon state law.

## **RELIEF REQUESTED**

Plaintiff respectfully requests that this Court:

A.    Enter a declaratory judgment that Defendants unlawfully retaliated against Plaintiff for her speech protected under the First Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and Or. Rev. Stat. Chapter 659A;

B.    Enter a declaratory judgment that Defendants violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and Or. Rev. Stat. Chapter 659A to be free from discrimination on the basis of race, including hostile work environment discrimination;

C.    Enter preliminary and permanent injunctions prohibiting Defendants from retaliating against Plaintiff or any other DEQ employee for exercising his or her right to protected speech;

D.    Enter preliminary and permanent injunctions prohibiting Defendants from discriminating on the basis of race in any aspect of employment;

E.      Enter preliminary and permanent injunctions requiring Defendants to expunge and permanently delete any records related to their sham "investigation" into whether Plaintiff's protected speech caused "harm" to other employees;

F.      Enter preliminary and permanent injunctions forbidding Defendants from referring to, relying on, considering, or in any other way using their "investigation" into the alleged impacts of Plaintiff's speech in future determinations concerning Plaintiff's employment, benefits, salary, promotions, access to mentoring, or access to other soft human resources items;

G.      Enter preliminary and permanent injunctions forbidding Defendants from referring to, relying on, considering, or in any other way using Plaintiff's protected speech in future determinations concerning Plaintiff's employment, benefits, salary, promotions, access to mentoring, or access to other soft human resources items;

H.      Enter preliminary and permanent injunctions requiring Defendants to provide Plaintiff with written performance reviews pursuant to standard policies and practices;

I.      Enter preliminary and permanent injunctions requiring Defendant DEQ to implement a rigorous policy protecting employees' First Amendment rights and to provide meaningful training to all DEQ supervisory and managerial employees regarding employees' rights to freedom of expression and freedom of speech;

J.      Enter preliminary and permanent injunctions requiring Defendant DEQ to cover the simple interest that Ms. Johnson could have accrued, if she had been paid her Lead Worker salary during the course of the sham investigation, such that she is made whole in terms of her salary;

K.      Retain jurisdiction of this matter for the purpose of enforcing the Court's orders, including the potential entry of a consent decree or supervisory decree against DEQ;

L.      Enter an award of damages against Defendant DEQ and the individual Defendants in their personal capacities, including but not limited to, all wage loss, emotional distress, special, general, compensatory, and/or other damages pursuant to law;

M.      Enter an award of punitive damages against the individual Defendants in their personal capacities;

N.      Award Plaintiff pre- and post-litigation interest as authorized by law;

O.      Award Plaintiff relief from tax consequences as provided by law;

P.      Enter an award of attorney fees and costs of suit against all Defendants pursuant to 42 U.S.C. § 1988, Fed. R. Civ. P. 54, Or. Rev. Stat. Chapter 659A.885, and Or. Rev. Stat. 20.107; and

Q.      Order such other and further relief as the Court may deem just, proper and necessary under the circumstances.

## **JURY DEMAND**

Plaintiff requests a trial by jury on all issues and claims so triable.

DATED this 12th day of February 2024.       Respectfully submitted,

_/s/ James L. Kerwin_
James L. Kerwin*
William E. Trachman*
MOUNTAIN STATES LEGAL
FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax: (877) 349-7074
jkerwin@mslegal.org
wtrachman@mslegal.org
*_Pro Hac Vice_ status pending

Herbert G. Grey, Attorney at Law
OSB No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005
(503) 641-4908
herb@greylaw.org

_Attorneys for Plaintiff_

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

*Johnson v. State of Oregon Department of Environmental Quality, et al.*

INDEX OF EXHIBITS TO COMPLAINT

| EXHIBIT | DESCRIPTION |
|---|---|
| 1. | Notice of Claim Pursuant to ORS 30.275 |
| 2. | DAS Job Profile Specification |
| 3. | 2018.09.19 Offer Letter |
| 4. | DEQ Affirmative Action Plan 19-21 (Revised) |
| 5. | Equity Based Organizational Assessment for Oregon DEQ |
| 6. | White Supremacy Culture |
| 7. | White Supremacy Culture - Still Here |
| 8. | Emails 2023.07.12 to 2023.07.14 |
| 9. | Email 2023.07.17 |
| 10. | 2023.08.08 DAS Retaliation Complaint |
| 11. | DAS 2024.02.05 Letter |
| 12. | EEOC Charge No. 551-2023-02513 |
| 13. | Notice of Right to Sue 551-2023-02513 |
| 14. | EEOC-BOLI Charge No. 551-2023-05187 |
| 15. | Notice of Right to Sue 551-2023-05187 - EEOC |
| 16. | Notice of Right to Sue 551-2023-05187 - BOLI |