# Exhibit 8

| | |
|---|---|
| **From:** | JOHNSON Danielle M * DEQ |
| **To:** | FAIRCHILD Ned * DEQ |
| **Subject:** | RE: For our check-in: Yesterday"s OA Presentation |
| **Date:** | Friday, July 14, 2023 10:48:00 PM |
| **Attachments:** | image001.png |
| | image002.png |

Hi Ned,

My concern is that, like you, there are a lot of people at DEQ (and elsewhere) who aren't familiar with employment law and who have been led to believe that any inequity in employment outcomes is something that can and should be "remedied" through employment policies and practices. However, this would be extremely difficult to achieve legally.

I would respectfully reiterate that the Supreme Court has reaffirmed that it is patently unconstitutional to, as the OA suggests, treat people of all races in a systematic way so as to result in equitable opportunities and outcomes for all (if by, "for all" the OA means population-wide). If racial justice in employment (or otherwise) requires putting in place "deliberate systems and supports to achieve and sustain racial equity [(population-wide)] through proactive and preventative measures," then racial justice cannot be achieved legally. The Constitution requires equal opportunity; it does not require or expect equitable outcomes. And it does not permit equitable outcomes if achievement of such would require violation of the law.

I would appreciate if you would please pass along my comments to DEQ leadership. Please also include the following important information for their consideration:

Per 607.1(b)(2) of EEOC's Compliance Manual on Affirmative Action, if DEQ's draft 21-23 AAP was not expressly approved, it would be considered and handled as an unapproved or "voluntary" plan. Per 607.11(a)(2), if a voluntary AAP by a state or local government employer is permissible at all without a formal finding of past discrimination, then section 607.13 would apply to the AAP. The AAP would need to contain 1) a reasonable self analysis, 2) a reasonable basis for believing that affirmative action is appropriate, and 3) reasonable action. I do not believe DEQ's draft 21-23 AAP meets these requirements.

Per 607.13, in general, reasonable self analysis requires using a method which produces evidence of the effect of the <u>employer's employment practices</u> (i.e., not the effect of something beyond the employer's control). As I noted previously, DEQ's draft 21-23 AAP does not distinguish between job classifications when reporting on staff racial and gender proportions (i.e., it compares proportions for the management population of DEQ to the proportions of the population of all existing DEQ staff, and it compares proportions for the population of all existing DEQ staff to those of the entire workforce population of Oregon). This is problematic.

As the example in EEOC's CM-604.3(b) (Compliance Manual on Theories of Discrimination) suggests, it is only appropriate to compare the racial percentages of an employer's workforce population with the percentage of the entire workforce population of the recruiting area if the job skills involved in the employer's workforce population consist of skills that most people in the entire workforce population have. In the example, a trucking company's workforce requires the ability to drive a truck – a skill that many people possess or can readily acquire. However, if a given job classification

requires specific skills (e.g., hydrogeologist, engineer, lawyer, etc.), the percentage of people in each of the employer's job classifications by race and gender should be compared with the percentage of people with such skills in the workforce population of the recruiting area (i.e., the "relevant labor force").

Per 607.14, because DEQ did not conduct a reasonable self analysis in its draft 21-23 AAP, DEQ does not appear to have a reasonable basis for believing that affirmative action is appropriate.

Per 607.15, because DEQ does not appear to have a reasonable basis for believing that affirmative action is appropriate, any affirmative actions DEQ has taken toward racial and gender equity under that plan appear to have been unreasonable.

It is my sincerest hope that DEQ will take this information into consideration to develop an approvable AAP that will allow for reasonable self analysis and, if a reasonable basis for believing that affirmative action is necessary can be found, reasonable action is taken on the part of DEQ to attempt to correct the effects of any discriminatory employment policies or practices DEQ has used.

I should note, per 607.15(e)(3), AAPs are allowed to correct a racial, sexual, or ethnic imbalance, but they are <u>not permitted</u> to sustain/maintain one, as the definition of Racial Justice in the OA suggests would be desirable.

Thank you for passing this information along to DEQ Leadership.
Sincerely,
Dani

**From:** FAIRCHILD Ned * DEQ
**Sent:** Thursday, July 13, 2023 4:50 PM
**To:** JOHNSON Danielle M * DEQ
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Dani,

If you would like I will pass along your comments to leadership, as I am neither a lawyer nor an HR professional I do not feel I can speak authoritatively on the substance of your comments.

I do want to respectfully acknowledge to you that I do not personally share your interpretations or conclusion on this topic.

In my (non-exhaustive) reading of both, I do not interpret anything in the OA or the 2021 – 2023 Affirmative Action Plan to be advocating for illegal or discriminatory practices. As an experienced hiring manager for DEQ I do not now, nor have I ever felt conflicted between my professional obligations and upholding the law.

The OA says of Racial Justice (to your quote): "It is not just the absence of discrimination and inequities, but also the presence of deliberate systems and supports to achieve and sustain racial

equity through proactive and preventative measures." It seems to me that the absence of discrimination and inequities for all is foundational to the OA.

Respectfully,
Ned

Pronouns: he/him Why share pronouns?

mobile:

**PUBLIC RECORDS LAW DISCLOSURE: This is a public record. This e-mail is subject to the State Retention Schedules and may be made available upon request.**

**From:** JOHNSON Danielle M * DEQ
**Sent:** Wednesday, July 12, 2023 9:12 PM
**To:** FAIRCHILD Ned * DEQ
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Ned,
Here's the article I mentioned in our check-in today that discusses how, <u>even if</u> an employer has an "approved" affirmative action plan (AAP) because they've had a past finding of illegal discrimination (which the City of Omaha had – I don't know if DEQ has and approved AAP, but I don't think so especially because the 21-23 plan was a "draft" plan), they cannot give preference based on race or gender to try to achieve placement goals in an effort to remedy the past discrimination. The author states (underlines all mine):

"[I]t would be a good time to refresh managers' recollections that it is <u>never</u> acceptable to make any employment decisions based on race or gender. The setting of a placement goal in an affirmative action plan means that recruiters have an added burden to try to ensure that applicant pools contain sufficient percentages of qualified women and minorities; it does not give a manager justification to hire someone because he or she is a minority, even if there is a goal in the job group. At all times, the <u>most</u> qualified person must be selected for the position, <u>without regard to</u> race, gender or any other protected category." This sentiment is echoed in CFR 60-2.16(e) (which is worth the quick read).

And here's the CFR 1607.17 Policy statement on affirmative action I mentioned. It is "*intended to assist State and local governments by illustrating the kinds of analyses and activities which may be appropriate for a public employer's <u>voluntary</u> [not "approved"] affirmative action plan.*" It states, "*The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether precentages of sex, race, or ethnic groups <u>in individual job classifications</u> are substantially similar to the precentages of those groups available in the <u>relevant job market</u> who possess the basic job-related qualifications.*" And "*The goal of any affirmative action plan should be achievement of genuine <u>equal employment opportunity</u> for all qualified persons. Selection under such plans should be based upon the ability of the applicant(s) to do the work. Such plans should not require the selection of the unqualified, or the unneeded, nor should they require the selection of persons on the basis of race, color, sex, religion, or national*

*origin.*"

DEQ's AAP does not analyze DEQ's workforce <u>in individual job classifications</u> and then compare the race/sex/ethnic percentages to the race/sex/ethnic percentages available in the <u>relevant job market</u> who possess the basic job-related qualifications. Instead, manager demographic goals are based on the population of existing DEQ staff, aiming to have the demographics of management at DEQ proportionally match the demographics of the pool of all DEQ staff. And staff demographic goals are based on the demographics of the workforce population of Oregon, aiming for proportional representation. These goals are inappropriate and discriminatory because the demographics of the workforce population of Oregon do not proportionally match the demographics of the pool of qualified candidates in the relevant job markets for each of the individual job classifications. The above policy statement on AA suggests goals should be aiming for <u>equal employment opportunity</u>, not equitable employment outcomes (because, as the Supreme Court noted in the SFFA cases, racial balancing is unconstitutional).

This information, along with information presented in the DEQ Organizational Assessment and the OA Presentations, is what led me to ask my questions about the legality of anti-racism and equity work. If the goal of anti-racism work is to achieve racial equity (i.e., racially proportional representation, as highlighted in the opening paragraph of the "Reimagining HR" section of the OA on p. 100), but racially proportional representation relative to society as a whole can only be achieved through illegal, discriminatory practices, then what does that mean for DEQ? How does DEQ achieve racial justice (as defined in the OA on pp. 146-147) if providing "deliberate systems and support to achieve and sustain racial equity through proactive and preventative measures" is unconstitutional? What is the implication for our constitution?

I would welcome a response from DEQ Leadership.
Thanks,
Dani

**From:** JOHNSON Danielle M * DEQ
**Sent:** Wednesday, July 12, 2023 1:31 PM
**To:** FAIRCHILD Ned * DEQ
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Ned,
Yeah, it seemed like some people were upset by my questions "Is it legal to deliberately treat people differently based on their race (or any other protected class status) in employment decisions?" and "Does anti-racism work require ignoring some laws?" And, in response to Leela's response to my questions that "the status quo is people from marginalized groups are already treated differently in spite of the law, this is what we are trying to change," my question "Is that advocacy of illegal conduct?"

I was genuinely curious if I was missing something that somehow makes the anti-racism efforts Engage to Change was advocating legal. They didn't directly answer my questions. Instead, Rakeem questioned whether all laws are just and equitable (including clearly discriminatory laws that were

long ago overturned through legal processes), and suggested we already have preferences for whiteness in society because there is disproportionate representation in every institution in the country – as if to suggest that giving preferences for non-whiteness should therefore be acceptable to "correct" the disproportionality, even if doing so is illegal. I indicated I thought it was <u>as</u> absurd to assume that the <u>only</u> explanation for disproportionate representation by skin color is discrimination, as it is to assume that the <u>only</u> explanation for disproportionate representation by hair color or eye color (or any other characteristic) is discrimination. I pointed out that correlation does not prove causation. And I suggested that there is a process to go about changing unjust laws (if enough people agree the laws are unjust). I think going through that process would be preferable to DEQ ignoring or not abiding by existing anti-discrimination laws in employment decisions.

Kasia then opened up affinity spaces (breakout rooms) for all of the people who were hurt by my questions and comments.

A revealing comment in chat was, "Legality shouldn't be the measure of whether something is okay or not when it comes to issues revolving racism. Slavery was legal, segregation was legal, red lining was legal. Why is there such a focus on legality?" The commenter seemed to suggest our country's current anti-discrimination laws aren't "okay" and we shouldn't be focusing on whether it's legal or not to do what's "right." It was followed by the comment, "Would DEQ would adopt an OA that asks their employees to behave illegally? This is a clear dog whistle. Period." However, that's exactly what I'm concerned about.

As a management services employee, my understanding is that I am held to a higher standard of ethics. When I see something that appears to be advocating for illegal conduct, I feel compelled to ask about it and bring it to others' attention so that it can be explored and hopefully resolved. Ideally, we would all be reassured that DEQ intends to follow the letter of the law, even if that doesn't result in racial proportional representation because, as the Supreme Court stated in the SFFA case, "[O]utright racial balancing" is "patently unconstitutional."

I'm not sure I'll have much more to add when we meet, but we can start with that.
See you soon,
Dani



**Danielle Johnson, MBA, CPPO, CPPB, OPAC**
Land Quality Contract Officer
Oregon DEQ | Cleanup and Emergency Response
700 NE Multnomah Street, Suite 600
Portland, OR 97232

---

**From:** FAIRCHILD Ned * DEQ
**Sent:** Wednesday, July 12, 2023 11:43 AM
**To:** JOHNSON Danielle M * DEQ
**Subject:** For our check-in: Yesterday's OA Presentation

Hi Dani,

I heard from several people that there was a pretty intense exchange that you were a part of during the OA presentation yesterday. I was not there for the exchange, but joined the call shortly afterward. I would like to discuss it from your perspective at our check-in this afternoon.

Thanks,
Ned

Pronouns: he/him Why share pronouns?
ned.fairchild@deq.oregon.gov
mobile:

**PUBLIC RECORDS LAW DISCLOSURE: This is a public record.  This e-mail is subject to the State Retention Schedules and may be made available upon request.**