# COMPLAINT FORM
### DISCRIMINATION, HARASSMENT AND WORKPLACE ISSUE(S)

**DISCLOSURE**

Filing a written complaint is voluntary. Oregon state government takes all complaints of discrimination, harassment, unethical, unfair or unprofessional conduct seriously. Information submitted on this form is treated confidentially. Names and other identifying information is disclosed when it is necessary for investigation purposes. It is illegal to be intimidated, threatened, coerced, discriminated or retaliated against for filing this complaint. You are not required to use this form.

**PLEASE PRINT OR TYPE (Attach extra pages as necessary.)**

| YOUR NAME<br>Danielle Johnson | EMPLOYEE ID # |
|---|---|
| HOME PHONE (Please include area code) | WORK PHONE (Please include area code) |
| STREET ADDRESS | CITY, STATE, ZIP |
| EMAIL ADDRESS (If available) | ALTERNATE CONTACT METHOD (If applicable) |
| AGENCY / DIVISION / SECTION<br>Department of Environmental Quality / Land Quality /<br>Cleanup & Emergency Response | WORK LOCATION<br>Portland, OR |

**PLEASE IDENTIFY THE PERSON(S) AND/OR DIVISION/SECTION AGAINST WHOM/WHICH YOU ARE FILING THIS COMPLAINT.**

NAME(S) OF ACCUSED
Penny Robertson, DEQ HR Manager
Leah Feldon, DEQ Director

| AGENCY / DIVISION / SECTION<br>Department of Environmental Quality / Human<br>Resources & Senior Leadership | PHONE NUMBER<br>(Penny Robertson)<br>(Leah Feldon) |
|---|---|

**PLEASE ANSWER THE FOLLOWING QUESTIONS PERTAINING TO YOUR COMPLAINT (Attach additional pages as necessary).**

Describe what happened. Please be as specific as possible including dates.
On 10/10/2022, I filed a discrimination complaint with DAS CHRO against DEQ (primarily DEQ HR). DEQ HR learned of the complaint and reached out to DAS CHRO to request the complaint be turned over to DEQ HR so that DEQ HR could use its external 3rd party investigator to assist DEQ HR with its investigation.

On 3/5/2023, I filed a whistleblower/discrimination complaint with OFCCP which then transferred my complaint by MOU to EEOC.

On 5/23/2023, the result of DEQ HR and its external 3rd party's investigation into my complaint was sent to me. The report did not accurately reflect my complaint and suggested the unlawful discrimination I had been subjected to was merely my personal dissatisfaction with DEQ's policies of diversity, equity, and inclusion.

On 6/21/2023, the DEQ Spring 2023 Organizational Assessment ("OA") conducted by DEQ's anti-racism and racial equity consultant, Engage to Change, was sent to all DEQ staff. The OA advocated for DEQ to treat people differently in employment decisions on the basis of their protected class status.

On 7/6/2023, EEOC issued my Notice of Right to Sue to both me and DEQ HR, in response to my

whistleblower/discrimination complaint (attached).

On 7/11/2023, at a well-attended (~150 DEQ staff) OA Presentation where the consultants reiterated the message advocating that DEQ treat people differently in employment decisions on the basis of protected class, I asked them out of a reasonable, good-faith curiosity, if that was somehow lawful to do (which I had asserted in my whistleblower/discrimination complaint to EEOC was not, but I wondered if I was missing some important explanation). This apparently offended some DEQ staff.

On 7/12/2023, my boss, Ned Fairchild, and I discussed via email and at our bi-weekly check-in what had happened at the OA Presentation. That afternoon, I also discovered EEOC's Notice of Right to Sue, for which I had missed the notication when it was first issued.

On 7/17/2023, 6 days following the presentation and 11 days following EEOC's submission of my Notice of Right to Sue, without first attempting to obtain my side of the story, Director Feldon sent an agency-wide, all-staff (~800 staff) email condemning my behavior and equating the harm caused by my conduct at the OA Presentation to the harm caused by a recent racist antisemitic diatribe to which some staff had been inadvertently subjected. She grossly mischaracterized my conduct as "aggressive resistance," which would be more accurately characterized as a respectful questioning and differing of opinion in a moderate volume and tone, although to my knowledge she did not attend the presentation. However, Penny Robertson did. At my request, Ned responded to that email to share my side of the story with Director Feldon and the rest of the DEQ Leadership Team (attached).

On 7/31/2023, Penny Robertson demoted me effective 8/1/2023 by suspending my Lead Worker duties and 5% Lead Worker pay pending an investigation to assess the impact of what occurred at the OA Presentation. Ned sent an email that evening to our HQ Cleanup Team to let everyone know my Lead Worker duties had been paused. To take my Lead Worker role away from me without due process is wrong. If there was someone on my team who didn't feel like I could adequately lead them because of my questions/comments at the OA Presentation, they could have been assigned to a different Lead Worker. DEQ HR has apparently already drawn its own conclusions and engaged in discipline without first investigating. This appears to be an adverse action in support of a pre-determined outcome.

This type of response from DEQ might deter a reasonable person from engaging in protected activity.

How does this adversely / negatively impact you?

This retaliation negatively impacts me by reducing my income and my level of job responsibility, as well as tarnishing my reputation with my coworkers (at least some of whom may have been led to believe my Lead Worker duties were paused for something I am guilty of and for which the suspension was appropriate punishment when there has been no finding of fault) and frankly, tarnishing my reputation with everyone who attended the OA Presentation and everyone who received Director Feldon's email.

Witnesses.  List all names and positions of anyone who witnessed the conduct or incident.

There were roughly 150 DEQ employees at the OA Presentation, as well as at least 2 presenters from Engage to Change. I have a recording of a portion of the presentation, which I made with the intent to capture alleged unlawful activity, and which I reasonably believed could be used as evidence in a judicial or administrative proceeding. Please let me know if you would like me to send you that recording and/or the ~160 page DEQ Organizational Assessment.

The agency-wide all staff email from Director Feldon  was presumably witnessed by all/most ~800 DEQ employees.

The DEQ Leadership Team (email group includes Stacey O'Neil, Keith Andersen, Brian Boling, Matthew Davis, Shannon Davis, Lydia Emer, Harry Esteve, Leah Feldon, Sue Langston, Travis Luckey, Ali Mirzakhalili, Monique Oliver, Lori Pillsbury, Christine Svetkovich, Jennifer Wigal, and Lauren Wirtis) were witnesses to the email from Ned conveying my side of what happened at the OA Presentation.

Have you attempted to resolve the concern?  If so, please describe in detail.

Yes, following my meeting with Penny on 7/31/2023, during which she notified me that my Lead Worker duties were being suspended pending investigation of the impact of what happened at the OA Presentation, I reached out to the DEQ Leadership Team by email to ask them to consider how the agency deals with harrassment of and retaliation against employees who whistle blow about unlawful employment practices and report about unlawful discrimination. The only response I received was from Penny Robertson (presumably someone on the DEQ Leadership Team forwarded her my email) late on 7/31/2023, indicating she had addressed things appropriately

by suspending my Lead Worker role until the investigation could be completed by an outside investigator (which was then anticipated to be complete by the end of August). She followed up on 8/4/2023 to indicate the investigator wasn't immediately available so wouldn't start work until the end of August, and results would likely not be provided until the end of September (attached).

Do you believe that the action(s) taken against you were because of a protected class*?
I believe the actions taken against me were in retaliation for engaging in protected activity.

*Protected class may include the following (for a complete list refer to State HR Policy, Discrimination and Harassment Free Workplace 50.010.01): age, color, disability, sex, family medical leave, medical condition, religion, national origin/ancestry, race, sexual orientation, veteran status.

SIGNATURE *(Please sign and date this form. You do not need to sign if submitting via email, email submission represents signature.)*

| | |
|---|---|
| | 8/8/2023 |
| EMPLOYEE SIGNATURE | DATE |

PLEASE INCLUDE ANY DOCUMENTATION YOU BELIEVE IS RELEVANT TO YOUR COMPLAINT.

RETURN THIS FORM TO:

## HUMAN RESOURCES OFFICE

, OR
FAX #:
EMAIL:

**FOR AGENCY HR USE ONLY.** THIS FORM WAS COMPLETED BY:

☒ Complainant (employee filing the complaint)          ☐ HR Employee (name) _____

☐ Another employee (on behalf of complainant)          ☐ Manager / Supervisor (name) _____

☐ Other (specify) _____

**FOR AGENCY HR USE ONLY.** THE INFORMATION ON THIS FORM WAS GATHERED:

☐ By phone                                              ☐ In person

☒ Submitted by the complainant.                         ☐ Other (specify) _____



# COMPLAINANT CONSENT FORM
### DISCLOSURE OF IDENTITY DURING INVESTIGATION

In order to expedite the investigation of your complaint, please read, sign, and return a copy of this consent form with your complaint.  Please make a copy for your records.

- As a complainant, I understand that in the course of the investigation of my complaint it may become necessary to reveal my identity or identifying information about me to person(s) at the entity or agency under investigation or to other persons, agencies, or entities.

- I also understand that it may be necessary to disclose personally identifying information, gathered as a part of the investigation of my complaint.

- In addition, I understand that as a complainant I am protected from being intimidated, threatened, coerced, retaliated, or discriminated against because I have made a complaint, testified, assisted, or participated in any manner in mediation, investigation, hearing, proceeding, or any other part of this investigation.

| PLEASE PRINT OR TYPE | |
|---|---|
| YOUR NAME<br>Danielle Johnson | EMPLOYEE ID #<br>███████ |
| HOME PHONE (Please include area code) | WORK PHONE (Please include area code)<br>███████ |
| STREET ADDRESS | CITY, STATE, ZIP |

| SIGNATURE *(Please sign and date this form.  You do not need to sign if submitting via email, email submission represents signature.)* |
|---|

_____                _____8/8/2023_____
EMPLOYEE SIGNATURE                                                          DATE

**JOHNSON Danielle M * DEQ**

**From:** ████████████████████████████

**Subject:**         FW: DEQ's DEI work and continual learning

**From:** ROBERTSON Penny * DEQ ███████████████████

**Sent:** Friday, August 4, 2023 4:39 PM

**To:** JOHNSON Danielle M * DEQ ████████████████████

**Subject:** Investigation Schedule

Dani,

The investigator we are engaging will not be able to start their work until the end of August.  Results of their work will likely not be provided until the end of September.

Penny

Penny Robertson
Oregon DEQ Human Resources and Payroll
Human Resources and Payroll Manager
███████████████████████
Cell: █████████████
Pronouns: She/Her/Hers | Why share pronouns?

**From:** ROBERTSON Penny * DEQ ███████████████████

**Sent:** Monday, July 31, 2023 6:09 PM

**To:** JOHNSON Danielle M * DEQ ██████████████████████

**Subject:** FW: DEQ's DEI work and continual learning

**Importance:** High

Dani,

I recognize you have concerns about processes.  In this case, I am addressing the complaints and comments shared with me appropriately and referring the matter to an outside investigator.  I will reach out to you with additional information or status on process as I can, but as I mentioned it will likely be 2 weeks before you hear anything further.

Penny

Penny Robertson
Oregon DEQ Human Resources and Payroll
Human Resources and Payroll Manager
███████████████████████
Cell: █████████████
Pronouns: She/Her/Hers | Why share pronouns?

**From:** JOHNSON Danielle M * DEQ █████████████████████

**Sent:** Monday, July 31, 2023 11:43 AM

**To:** DEQ *DEQ - Leadership Team ████████████████████

**Cc:** FAIRCHILD Ned * DEQ ██████████████

1

**Subject:** RE: DEQ's DEI work and continual learning
**Importance:** High

My understanding is that the DEQ Leadership Team will be meeting this Wednesday, 8/2, to discuss DEQ's timeliness of responding to incidents that cause harm to staff. I'm hopeful you will include in that meeting some discussion about how to deal with harassment of and retaliation against employees who whistle blow about unlawful employment practices and report about unlawful discrimination, given that Leah's 7/17 email came just 11 days after the EEOC notified DEQ of my right to sue for discrimination following my filing of a formal complaint. I assume you all have seen that complaint but, if not, Penny or I may be able to provide it for your consideration. Additionally, Penny just informed me my lead worker duties will be suspended effective tomorrow, 8/1, until an investigation of what occurred at the OA presentation can be conducted by an external investigator.
Dani



**Danielle Johnson, MBA, CPPO, CPPB, OPAC**
Land Quality Contract Officer
Oregon DEQ | Cleanup and Emergency Response
700 NE Multnomah Street, Suite 600
Portland, OR 97232

---

**From:** FAIRCHILD Ned * DEQ
**Sent:** Monday, July 17, 2023 11:27 AM
**To:** DEQ *DEQ - Leadership Team
**Cc:** JOHNSON Danielle M * DEQ <Danielle.M.JOHNSON@deq.oregon.gov>
**Subject:** RE: DEQ's DEI work and continual learning
**Importance:** High

Good morning,

I would like to provide contextual information on behalf of one of my direct reports, Danielle Johnson (cc'd), regarding the conversation at the OA presentation referenced below.

Please see the attached email conversation.

As Danielle is aware, I do not share the interpretations or conclusions put forth. However, as I am not an authority on employment law, nor either the Agency Affirmative Action Plan or the Organizational Assessment, I am relaying the concern (per Danielle's request) to this group.

Best,
Ned

**Ned Fairchild**
Environmental Cleanup HQ Manager
Land Quality Division
Oregon Department of Environmental Quality
Mobile:
email:
Pronouns: he/him  Why share pronouns?
**DEQ's Headquarters Office:**
**700 NE Multnomah St., Suite #600**
**Portland, OR 97232-4100**

PUBLIC RECORDS LAW DISCLOSURE: This is a public record.  This e-mail is subject to the State Retention Schedules and may be made available upon request.

**From:** FELDON Leah * DEQ ██████████████████████
**Sent:** Monday, July 17, 2023 9:30 AM
**To:** DEQ [ALL DEQ] All DEQ Staff Statewide ██████████████████████
**Subject:** DEQ's DEI work and continual learning

Dear DEQ,

I want to acknowledge and express my concern and regret over two recent public incidents that have shown our agency has much work ahead of us as we move toward a workplace culture that embraces anti-racism and equity. These incidents demonstrate the very real harm that occurs regularly to our BIPOC (Black, Indigenous and People of Color) employees, and our white colleagues who are part of marginalized communities.

A few weeks ago, Water Quality staff were subject to a racist and antisemitic diatribe that was inadvertently broadcast during an online training session. This incident has prompted ongoing conversations about the timeliness of DEQ's response and will be the topic of a facilitated discussion on Aug. 2.

Last week, during a well-attended session to discuss the recently released Organizational Assessment, participants witnessed aggressive resistance to the insight and analysis contained in the assessment, rather than open, thoughtful inquiry to promote understanding. Consultants from Engage to Change, who produced the assessment and facilitated the meeting, interrupted the dialog with respectful feedback to the speaker. Nonetheless, staff who were seeking an earnest conversation about the assessment were subjected to hurtful comments. To be clear, curiosity, questions and sharing of feelings about the assessment are welcome, but as we move into this work, we must think about others in the room and how our comments may feel for them. We must strive to do our learning in places and manners that do not continue harm.

Both of these cases are public examples of what DEQ BIPOC employees experience in often non-public ways, and we can and must learn from these instances.

I and the DEQ Leadership Team are currently engaged in reading and absorbing the Organizational Assessment. Among its lessons is the self-reflection required for progress to be made. For those who witnessed the two incidents described here, and those who may have heard about them, it is a good time to look inward and think about the impact on yourself and your colleagues. For those who were harmed, I am sorry.

The Leadership Team will continue discussing the OA in upcoming meetings and will start looking at the recommendations provided by ETC. It is too early in the process to begin outlining what the next steps will be for DEQ, other than to encourage continued conversations about the OA content. My commitment to you is to keep you informed as we proceed with this difficult but necessary work.

Leah


Leah K. Feldon
Director
Oregon Department of Environmental Quality
██████████████████████

(she/her)

*Executive Assistant: Stacey O'Neil Jones*
██████████████████████

| | |
|---|---|
| **From:** | |
| **To:** | |
| **Subject:** | RE: For our check-in: Yesterday"s OA Presentation |
| **Date:** | Friday, July 14, 2023 10:48:00 PM |
| **Attachments:** | image001.png |
| | image002.png |

Hi Ned,

My concern is that, like you, there are a lot of people at DEQ (and elsewhere) who aren't familiar with employment law and who have been led to believe that any inequity in employment outcomes is something that can and should be "remedied" through employment policies and practices. However, this would be extremely difficult to achieve legally.

I would respectfully reiterate that the Supreme Court has reaffirmed that it is patently unconstitutional to, as the OA suggests, treat people of all races in a systematic way so as to result in equitable opportunities and outcomes for all (if by, "for all" the OA means population-wide). If racial justice in employment (or otherwise) requires putting in place "deliberate systems and supports to achieve and sustain racial equity [(population-wide)] through proactive and preventative measures," then racial justice cannot be achieved legally. The Constitution requires equal opportunity; it does not require or expect equitable outcomes. And it does not permit equitable outcomes if achievement of such would require violation of the law.

I would appreciate if you would please pass along my comments to DEQ leadership. Please also include the following important information for their consideration:

Per 607.1(b)(2) of EEOC's Compliance Manual on Affirmative Action, if DEQ's draft 21-23 AAP was not expressly approved, it would be considered and handled as an unapproved or "voluntary" plan. Per 607.11(a)(2), if a voluntary AAP by a state or local government employer is permissible at all without a formal finding of past discrimination, then section 607.13 would apply to the AAP. The AAP would need to contain 1) a reasonable self analysis, 2) a reasonable basis for believing that affirmative action is appropriate, and 3) reasonable action. I do not believe DEQ's draft 21-23 AAP meets these requirements.

Per 607.13, in general, reasonable self analysis requires using a method which produces evidence of the effect of the employer's employment practices (i.e., not the effect of something beyond the employer's control). As I noted previously, DEQ's draft 21-23 AAP does not distinguish between job classifications when reporting on staff racial and gender proportions (i.e., it compares proportions for the management population of DEQ to the proportions of the population of all existing DEQ staff, and it compares proportions for the population of all existing DEQ staff to those of the entire workforce population of Oregon). This is problematic.

As the example in EEOC's CM-604.3(b) (Compliance Manual on Theories of Discrimination) suggests, it is only appropriate to compare the racial percentages of an employer's workforce population with the percentage of the entire workforce population of the recruiting area if the job skills involved in the employer's workforce population consist of skills that most people in the entire workforce population have. In the example, a trucking company's workforce requires the ability to drive a truck – a skill that many people possess or can readily acquire. However, if a given job classification

requires specific skills (e.g., hydrogeologist, engineer, lawyer, etc.), the percentage of people in each of the employer's job classifications by race and gender should be compared with the percentage of people with such skills in the workforce population of the recruiting area (i.e., the "relevant labor force").

Per 607.14, because DEQ did not conduct a reasonable self analysis in its draft 21-23 AAP, DEQ does not appear to have a reasonable basis for believing that affirmative action is appropriate.

Per 607.15, because DEQ does not appear to have a reasonable basis for believing that affirmative action is appropriate, any affirmative actions DEQ has taken toward racial and gender equity under that plan appear to have been unreasonable.

It is my sincerest hope that DEQ will take this information into consideration to develop an approvable AAP that will allow for reasonable self analysis and, if a reasonable basis for believing that affirmative action is necessary can be found, reasonable action is taken on the part of DEQ to attempt to correct the effects of any discriminatory employment policies or practices DEQ has used.

I should note, per 607.15(e)(3), AAPs are allowed to correct a racial, sexual, or ethnic imbalance, but they are <u>not permitted</u> to sustain/maintain one, as the definition of Racial Justice in the OA suggests would be desirable.

Thank you for passing this information along to DEQ Leadership.
Sincerely,
Dani

---

**From:** FAIRCHILD Ned * DEQ ███████████████████████
**Sent:** Thursday, July 13, 2023 4:50 PM
**To:** JOHNSON Danielle M * DEQ ███████████████████████
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Dani,

If you would like I will pass along your comments to leadership, as I am neither a lawyer nor an HR professional I do not feel I can speak authoritatively on the substance of your comments.

I do want to respectfully acknowledge to you that I do not personally share your interpretations or conclusion on this topic.

In my (non-exhaustive) reading of both, I do not interpret anything in the OA or the 2021 – 2023 Affirmative Action Plan to be advocating for illegal or discriminatory practices. As an experienced hiring manager for DEQ I do not now, nor have I ever felt conflicted between my professional obligations and upholding the law.

The OA says of Racial Justice (to your quote): "It is not just the absence of discrimination and inequities, but also the presence of deliberate systems and supports to achieve and sustain racial

equity through proactive and preventative measures." It seems to me that the absence of discrimination and inequities for all is foundational to the OA.

Respectfully,
Ned

Pronouns: he/him [Why share pronouns?](link)
██████████████████████████
mobile: ████████████

**PUBLIC RECORDS LAW DISCLOSURE: This is a public record. This e-mail is subject to the State Retention Schedules and may be made available upon request.**

---

**From:** JOHNSON Danielle M * DEQ ████████████████████████████
**Sent:** Wednesday, July 12, 2023 9:12 PM
**To:** FAIRCHILD Ned * DEQ ██████████████████
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Ned,
Here's [the article](link) I mentioned in our check-in today that discusses how, <u>even if</u> an employer has an "approved" affirmative action plan (AAP) because they've had a past finding of illegal discrimination (which the City of Omaha had – I don't know if DEQ has and approved AAP, but I don't think so especially because the 21-23 plan was a "draft" plan), they cannot give preference based on race or gender to try to achieve placement goals in an effort to remedy the past discrimination. The author states (underlines all mine):

"*[I]t would be a good time to refresh managers' recollections that it is <u>never</u> acceptable to make any employment decisions based on race or gender. The setting of a placement goal in an affirmative action plan means that recruiters have an added burden to try to ensure that applicant pools contain sufficient percentages of qualified women and minorities; it does not give a manager justification to hire someone because he or she is a minority, even if there is a goal in the job group. At all times, the <u>most</u> qualified person must be selected for the position, <u>without regard to</u> race, gender or any other protected category.*" This sentiment is echoed in [CFR 60-2.16(e)](link) (which is worth the quick read).

And here's the [CFR 1607.17 Policy statement on affirmative action](link) I mentioned. It is "*intended to assist State and local governments by illustrating the kinds of analyses and activities which may be appropriate for a public employer's <u>voluntary</u> [not "approved"] affirmative action plan.*" It states, "*The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether percentages of sex, race, or ethnic groups <u>in individual job classifications</u> are substantially similar to the precentages of those groups available in the <u>relevant job market</u> who possess the basic job-related qualifications.*" And "*The goal of any affirmative action plan should be achievement of genuine <u>equal employment opportunity</u> for all qualified persons. Selection under such plans should be based upon the ability of the applicant(s) to do the work. Such plans should not require the selection of the unqualified, or the unneeded, nor should they require the selection of persons on the basis of race, color, sex, religion, or national*

*origin.*"

DEQ's AAP does not analyze DEQ's workforce <u>in individual job classifications</u> and then compare the race/sex/ethnic percentages to the race/sex/ethnic percentages available in the <u>relevant job market</u> who possess the basic job-related qualifications. Instead, manager demographic goals are based on the population of existing DEQ staff, aiming to have the demographics of management at DEQ proportionally match the demographics of the pool of all DEQ staff. And staff demographic goals are based on the demographics of the workforce population of Oregon, aiming for proportional representation. These goals are inappropriate and discriminatory because the demographics of the workforce population of Oregon do not proportionally match the demographics of the pool of qualified candidates in the relevant job markets for each of the individual job classifications. The above policy statement on AA suggests goals should be aiming for <u>equal employment opportunity</u>, not equitable employment outcomes (because, as the Supreme Court noted in the SFFA cases, racial balancing is unconstitutional).

This information, along with information presented in the DEQ Organizational Assessment and the OA Presentations, is what led me to ask my questions about the legality of anti-racism and equity work. If the goal of anti-racism work is to achieve racial equity (i.e., racially proportional representation, as highlighted in the opening paragraph of the "Reimagining HR" section of the OA on p. 100), but racially proportional representation relative to society as a whole can only be achieved through illegal, discriminatory practices, then what does that mean for DEQ? How does DEQ achieve racial justice (as defined in the OA on pp. 146-147) if providing "deliberate systems and support to achieve and sustain racial equity through proactive and preventative measures" is unconstitutional? What is the implication for our constitution?

I would welcome a response from DEQ Leadership.
Thanks,
Dani

**From:** JOHNSON Danielle M * DEQ ███████████████████
**Sent:** Wednesday, July 12, 2023 1:31 PM
**To:** FAIRCHILD Ned * DEQ ████████████████████████
**Subject:** RE: For our check-in: Yesterday's OA Presentation

Hi Ned,
Yeah, it seemed like some people were upset by my questions "Is it legal to deliberately treat people differently based on their race (or any other protected class status) in employment decisions?" and "Does anti-racism work require ignoring some laws?" And, in response to Leela's response to my questions that "the status quo is people from marginalized groups are already treated differently in spite of the law, this is what we are trying to change," my question "Is that advocacy of illegal conduct?"

I was genuinely curious if I was missing something that somehow makes the anti-racism efforts Engage to Change was advocating legal. They didn't directly answer my questions. Instead, Rakeem questioned whether all laws are just and equitable (including clearly discriminatory laws that were

long ago overturned through legal processes), and suggested we already have preferences for whiteness in society because there is disproportionate representation in every institution in the country – as if to suggest that giving preferences for non-whiteness should therefore be acceptable to "correct" the disproportionality, even if doing so is illegal. I indicated I thought it was <u>as</u> absurd to assume that the <u>only</u> explanation for disproportionate representation by skin color is discrimination, as it is to assume that the <u>only</u> explanation for disproportionate representation by hair color or eye color (or any other characteristic) is discrimination. I pointed out that correlation does not prove causation. And I suggested that there is a process to go about changing unjust laws (if enough people agree the laws are unjust). I think going through that process would be preferable to DEQ ignoring or not abiding by existing anti-discrimination laws in employment decisions.

Kasia then opened up affinity spaces (breakout rooms) for all of the people who were hurt by my questions and comments.

A revealing comment in chat was, "Legality shouldn't be the measure of whether something is okay or not when it comes to issues revolving racism. Slavery was legal, segregation was legal, red lining was legal. Why is there such a focus on legality?" The commenter seemed to suggest our country's current anti-discrimination laws aren't "okay" and we shouldn't be focusing on whether it's legal or not to do what's "right." It was followed by the comment, "Would DEQ would adopt an OA that asks their employees to behave illegally? This is a clear dog whistle. Period." However, that's exactly what I'm concerned about.

As a management services employee, my understanding is that I am held to a higher standard of ethics. When I see something that appears to be advocating for illegal conduct, I feel compelled to ask about it and bring it to others' attention so that it can be explored and hopefully resolved. Ideally, we would all be reassured that DEQ intends to follow the letter of the law, even if that doesn't result in racial proportional representation because, as the Supreme Court stated in [the SFFA case](#), "[O]utright racial balancing" is "patently unconstitutional."

I'm not sure I'll have much more to add when we meet, but we can start with that.
See you soon,
Dani



**Danielle Johnson, MBA, CPPO, CPPB, OPAC**
Land Quality Contract Officer
Oregon DEQ | Cleanup and Emergency Response
700 NE Multnomah Street, Suite 600
Portland, OR 97232
███████████

---

**From:** FAIRCHILD Ned * DEQ ████████████████████████
**Sent:** Wednesday, July 12, 2023 11:43 AM
**To:** JOHNSON Danielle M * DEQ ████████████████████████
**Subject:** For our check-in: Yesterday's OA Presentation

Hi Dani,

I heard from several people that there was a pretty intense exchange that you were a part of during the OA presentation yesterday. I was not there for the exchange, but joined the call shortly afterward. I would like to discuss it from your perspective at our check-in this afternoon.

Thanks,
Ned

Pronouns: he/him [Why share pronouns?](Why share pronouns?)

█████████████████████

mobile: 9███████

**PUBLIC RECORDS LAW DISCLOSURE: This is a public record.  This e-mail is subject to the State Retention Schedules and may be made available upon request.**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 551-2023-02513 |

| Oregon Bureau of Labor & Industries - Civil Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Year of Birth |
|---|---|---|
| **Danielle Johnson** | ▮▮▮▮▮ | |

| Street Address | City, State and ZIP Code |
|---|---|
| ▮▮▮▮▮▮▮ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Oregon Department of Environmental Quality** | **501+ Employees** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **700 NE Multnomah Street Suite 600**<br>**PORTLAND, OR 97232** | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE |  |
|---|---|---|
| | Earliest | Latest |
| Disability, Religion | **10/12/2020** | **6/1/2023** |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

On October 15, 2018, I became employed by Respondent as a Contract Officer. I am still employed by Respondent as a Contract Officer. Throughout my employment I have performed the duties of my position in a satisfactory manner. Respondent is aware of my disability.

I hold sincere religious beliefs based on my ancestral heritage, combining elements of British Christianity, Icelandic paganism, and Cherokee animism and shamanism. Respondent (specifically, DEQ HR and possibly my manager, Ned Fairchild) is aware of it, as I disclosed my religion in my August 24, 2021, request for a religious exception to the COVID-19 Vaccination Requirement.

My religious beliefs include, among other things, the following:

   a.  I believe that God is everywhere and in everyone. We are all tied inextricably together in a network of mutuality where whatever affects one of us directly, affects all of us indirectly. I believe discrimination against or favoritism toward people based on their protected personal characteristics

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 6/6/2023 _____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 551-2023-02513 |

| Oregon Bureau of Labor & Industries - Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

affects the people who are hurt or helped directly, but is an injustice that ultimately harms all of us indirectly.

  b.  I believe that no one should be forced or pressured to participate in activities that violate their religious beliefs (as long as their beliefs do not unduly violate society's laws) or be oppressed by others who participate in such activities.

  c.  I believe that everyone is entitled to their own religious beliefs, and employers (especially government employers) should not unduly favor one religion over another, nor prefer religion over non-religion, nor prefer non-religion over religion. Employers should not tolerate evangelization and/or preaching from either side of opposing religious/anti-religious beliefs that creates a hostile work environment for those employees whose beliefs were disparaged or not endorsed, as well as for those employees who do not wish to engage in religious discourse in the workplace and/or do not wish to be converted to another employee's faith. I believe that in a pluralistic workplace where illegal discrimination and favoritism are not practiced, we cannot all bring our full selves to work; there would be too much unhealthy conflict if we did. Instead, we can all bring our "business professional" selves to work, accept and celebrate our differences and similarities in a neutral way, and try to get along and get the work done.

  d.  I believe that each of us is the unique sum of all our individual parts – a person's place in the world cannot be defined or dictated by any one of their protected personal characteristics (or any combination of only select protected personal characteristics). In addition, I believe that it is immoral (and unlawful in most employment decisions) to lump people into groups based on only one shared protected personal characteristic (or the combination of a set of select protected personal characteristics) and deliberately treat them, as a group, differently than members of other groups on the basis of that shared protected personal characteristic (or that combination of a set of select shared protected personal characteristics).

1.  On October 10, 2022, I formally filed a complaint with the Oregon Department of Administrative Services Chief Human Resources Office (DAS CHRO) against Respondent (primarily, DEQ HR), which was subsequently investigated with assistance from and immunity to DEQ HR.

2.  In my DAS CHRO complaint and investigation, I whistle blew that Respondent (primarily DEQ HR) has implemented discriminatory policies including, but not limited to, the following:

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 6/6/2023 _____<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC FEPA | **551-2023-02513** |

| **Oregon Bureau of Labor & Industries - Civil Rights Division** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

a. I reported and complained that Respondent required or pressured job applicants, interview panelists, and all DEQ employees to publicly share their protected class status information – their gender pronouns, which directly correspond to their gender identity, with no justifiable business purpose for knowing that information, in order to make only some interview panelists and job applicants feel welcome, respected, and included. The sharing of gender pronouns publicly, in email signature lines and during job interviews serves to indicate allyship with a favored in-group based on religious/anti-religious beliefs and rejection of a disfavored out-group based on differing religious beliefs. For all the effort Respondent has supposedly made to help reduce bias and to discourage interview panelists from considering an applicant's cultural fit, it's ironic that DEQ HR went ahead and embedded these blatantly biased practices – this religious/anti-religious favoritism, which makes some interview panelists and job applicants feel unwelcome, disrespected, and excluded. I believe this to be a discriminatory action based on the protected class of aggrieved persons.

b. I reported and complained that Respondent's policy of denying interview panelists access to written job applicant materials and denying job applicants the ability for interview panelists to review applicants' written application materials as part of the interview process, was discriminatory to job applicants with disabilities who rely on written materials to convey their job qualifications and discriminatory to interview panelists with disabilities who rely on written materials to make evaluations about selection of the most qualified applicant. I reported and complained that it was discriminatory that job applicants were restricted to conveying their qualifications to interview panelists verbally and visually, and interview panelists were restricted to making evaluations that rely primarily on how well candidates present themselves verbally and visually, without interview panelists having access to the written job applicant materials. I believe this to be a discriminatory action based on the protected class of aggrieved persons.

c. I reported and complained that Respondent's use of a draft 21-23 Affirmative Action Plan violates EEOC guidelines for the justification of a policy or practice based on race, sex, or national origin. The draft plan requires management and staff to actively work to implement the plan "as assertively as possible" to meet employment goals around race, gender, and veteran status of employees and managers that were not designed to achieve the purposes of Title VII of the Civil Rights Act. One of the stated goals of the plan is to "help develop and maintain a workforce that reflects the demographics of Oregon," as opposed to reflecting the demographics of the relevant qualified labor market in each job group. The goals appear not to be based on statistically significant differences between actual employment results and the results that would be expected based on availability of the relevant qualified labor market in each of the particular job groups, as instructed by CFR 1607.17. Instead, manager demographic goals are based on the population of existing DEQ staff, aiming to have the demographics of management at DEQ match the demographics of the pool of all DEQ staff. And staff demographic goals are based on the demographics of the workforce population of Oregon. These goals are inappropriate and discriminatory because the demographics of the workforce population of

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6/6/2023                    *[signature]* <br> Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 551-2023-02513 |

| Oregon Bureau of Labor & Industries - Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

Oregon do not match the demographics of the pool of qualified candidates in each of the job categories. I believe this to be a discriminatory action based on the protected class of aggrieved persons.

3. In my DAS CHRO complaint and investigation, I also identified that Respondent has subjected me to harms including, but not limited to, the following:

   a. On October 12, 2020, I was demeaned, intimidated, humiliated, and embarrassed by manager Shannon Davis in front of other managers, including Lydia Emer, my Division Administrator, for daring to share my beliefs that conflicted with the anti-racist training we were receiving and for expressing that some of the concepts being endorsed violated my beliefs, specifically, 1) that America, though flawed, is still the best country in the world because it is the freest and fairest, 2) that it is inappropriate/illegal to elevate the voices of some people because of their membership in a protected class group, and 3) that the presenters did not share enough information for us to be able to make an informed (i.e., rational, not purely emotional) opinion about what it means when resumes of people with black-sounding names receive fewer calls than resumes of people with white-sounding names. Following that conference, most management services non-supervisory employees, including me, were removed from invitations to manager meetings/conferences/emails without explanation. This caused me to lose access to information that other management services employees continued to receive. It was later explained that this was because the information shared in these venues was mostly related to supervisory functions. But I learned in a recent (Jan/Feb 2023) check-in with my boss, Ned, that some management services non-supervisory employees, including some DEQ HR and training and development staff, have continued to be included in those meetings/conference/emails. I believe this to be a discriminatory and retaliatory action against me based on my religion.

   b. On October 20, 2021, I was effectively outed as a member of the disfavored out-group when emails from upper management were sent encouraging all DEQ staff to publicly share their gender pronouns (i.e., gender identity) in their email signature lines to demonstrate allyship with people who may have been misgendered, and I declined. I believe being required or coerced to share my protected class status information publicly, especially if the sharing of that information would cause me to participate in discrimination against or favoritism toward individuals on the basis of their protected class status (i.e., their gender and/or their religion), to be a discriminatory action against me based on my religion.

   c. On September 7, 2022, my concerns were dismissed by DEQ HR when I suggested that the resume-less recruiting policy it designed (led by Recruitment Team Lead, Maddy Ouye) seemed discriminatory and the interview script template it disseminated to hiring managers for use in interviews, which required

---

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct. | |
| 6/6/2023 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| *Date*　　　*Charging Party Signature* | *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC FEPA | 551-2023-02513 |

| Oregon Bureau of Labor & Industries - Civil Rights Division | and EEOC |
|---|---|
| State or local Agency, if any | |

hiring managers, interview panelists, and job applicants to publicly share their gender pronouns/identity, and by inference their religious position (by asking in a non-optional way), seemed discriminatory. DEQ has since adjusted the script to call for interview panelists to publicly share their gender pronouns/identities, and by inference their religious position, and to request that interviewees share theirs if they're comfortable.

d.  On September 9, 2022, as an interview panelist, I requested a reasonable accommodation related to my disability (which I had disclosed to my manager, Ned, on September 7, 2022), and was initially firmly denied by DEQ HR Manager, Penny. I ultimately received my requested accommodation after a meeting with Penny and Ned the morning of September 12, 2022.

e.  On September 12, 2022, I participated on an interview panel where I was the only person in the interview to decline to publicly share my gender pronouns/identity and by inference my religious position, which confirmed to others in the interview my membership in the disfavored out-group.

f.  On February 23, 2023, following my disclosure of my disability and request for an accommodation, and following my filing of a religious discrimination complaint with DAS CHRO, I learned I was not invited to participate on an interview panel for which I had been strongly endorsed to the hiring manager by a coworker who was invited to participate as a panelist. I believe this to be a discriminatory action against me based on my disability and/or a retaliatory action against me based on my reporting and whistleblowing activities.

g.  From October 2020 to present, after Respondent was aware that anti-racist concepts endorsed at the Manager DEI Conference violated my religious beliefs, Respondent leadership has effectively asked me to set aside my religious beliefs against discrimination or favoritism in employment decisions on the basis of protected class status in order to join their religion/anti-religion. Respondent's actions include but are not limited to, the following:

•  Respondent has pressured or required me to share my protected class status information (my gender identity and with it my inferred religious position) publicly by 1) strongly encouraging me to include my gender pronouns in my email signature line, 2) requiring me to share my gender pronouns publicly in job interviews, and 3) continually sending me "Why Share Pronouns" hyperlinks in email signature lines to coerce me to join the in-group by sharing my gender pronouns/identity publicly. This is coercion and endorsement of a type of religion/anti-religion, in violation of the Establishment Clause and Free Exercise Clause of the 1st Amendment, and it is a

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6/6/2023 _____    _Darynni_____ Date              Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 551-2023-02513 |

| Oregon Bureau of Labor & Industries - Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

violation of equal protection under the 14th Amendment. In doing so, Respondent has discriminated against me and placed me at risk of others discriminating against me.

- Respondent has subjected me to proselytizing emails from upper management and the DEQ Pride and BIPOC affinity groups, encouraging DEQ staff to become better allies to the LGBTQIA2S+ and BIPOC communities. These emails are often shaming, demoralizing, and degrading, and they are offensive and unwelcoming because they promote and encourage dividing people into certain types of groups based on only certain aspects of peoples' (protected class status) identities and treating them differently because of their membership in a protected class, not because of anyone's individual needs. They seem intended to offend, shame, and disrespect those who have conflicting religious values – and they do offend me and my religious values.

- Respondent has subjected me to religious/anti-religious iconography at work by authorizing the creation and incorporation of DEQ Pride logos into websites, emails, social media, and employee Teams backgrounds and email signature lines. This symbol, which has effectively become a religious/anti-religious symbol, similar to the sharing of gender pronouns, allows the agency and employees to display their alliance with certain religious/anti-religious values, and serves to represent a rejection of other religious faiths.

h.  Taken together, this unwelcome, inappropriate, discriminatory behavior is severe and pervasive enough to create a hostile work environment towards me. The work environment or atmosphere (which constitutes a term, condition, or privilege of employment) that Respondent has established and maintained at my place of work supports discriminatory practices and activities that cause me emotional and psychological harm.

- As of today, June 4, 2023, Respondent's harassment continues. My proposed remedies include the following: I want DEQ to stop coercing employees and job applicants to publicly share their gender identities and by inference their religious/anti-religious beliefs, stop denying interview panelists access to written job applicant materials, stop endorsing and promoting proselytizing by in-group members, stop creating and disseminating religious/anti-religious iconography (specifically, DEQ Pride logos), and stop assertively implementing the unlawful 21-23 draft Affirmative Action plan. I want DEQ to publicly apologize for their discriminatory actions, make whole the people against whom they've discriminated, and take affirmative action to attract, hire, retain and promote people with diverse religious beliefs. I want to be invited back to management meetings/conferences/emails, and I want to be included on interview panels again.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct. | |
| 6/6/2023         *[signature]* <br> Date         Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.    **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.    **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.    **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.    **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.    **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

August 26, 2021

Ms. Susan Korn, Human Resources Manager
Department of Environmental Quality
700 NE Multnomah Street, Suite 600
Portland, OR 97232
Via email: ███████████████████

RE: Request for Religious Exemption to COVID-19 Vaccination Requirement

Dear Sue:

I am writing to request a religious exemption to the State's COVID-19 vaccination requirement, as this requirement violates my genuine and sincerely held religious beliefs which are contrary to the practice of vaccination against diseases which I have already contracted and from which I have already recovered.

My mother raised me outside of organized religion, as she wanted me to make my own religious decisions when I came of an age where I could do so without her undue influence. As an adult, this led me to adopt a syncretic religion based on my ancestral heritage, combining elements of British Christianity, Icelandic paganism, and Cherokee animism and shamanism. The religious principles that guide my objection to vaccination against diseases which I have already contracted and from which I have already recovered are:

- Belief that manipulating and corrupting the natural world, including denying the benefits of natural immunity to disease (i.e., to protect both the individual and others who come into contact with that individual) and forcing vaccines on those already naturally immune, is offensive to God
- Belief that modern medicine is not always superior to natural remedies to disease and may, in some cases, complicate, hinder, or undermine long-term mental and physical health of those forcibly subjugated and subjected to it
- Belief that weighing the risks and benefits of medical procedures against an individual's unique health profile – not assuming the same medical procedure should be applied to all people regardless of their individual health profiles – is God's wish, and the results of that careful and thoughtful assessment based on all available information are in God's hands

I have adhered to the principles and practices of my faith for most of my life, but my faith has grown most significantly over the last twenty years, since I traveled and lived abroad, graduated at the top of my classes from undergraduate and graduate business schools, married, and had children.

My religious beliefs have impacted my decisions on other medically related matters, including decisions I made during my most recent pregnancy that went against the medical advice being administered. The advice was in violation of my religious beliefs against over-medicalizing my pregnancy. I am grateful I was not mandated to follow the medical advice I was given on penalty of losing my job and my ability to support my family.

Accepting forced/coerced vaccination would compromise my genuine and sincerely held religious beliefs by denying that my natural immunity, given by God, is an acceptable form of immunization against COVID-19 and that only "immunization" by novel vaccine is acceptable. Since the COVID-19 vaccines do

not actually confer immunity and do not prevent transmission to others (they merely produce an immune response that reduces severe symptoms of the disease – symptoms of which I have little to no risk of facing, for a disease I have little to no risk of spreading, as someone who is naturally immune) there would be little to no benefit and huge potential detriment to me receiving a COVID-19 vaccine.

Please advise if there is anything else you need from me to make your determination on my request for a religious exemption to the COVID-19 vaccination requirement. Thank you for your consideration.

Sincerely,
Danielle Johnson
Land Quality Contract Officer
█████████