IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIELLE JOHNSON,                                    Case No. 3:24-cv-00279-JR

       Plaintiff,                                 FINDINGS AND
                                                     RECOMMENDATION
   v.

STATE OF OREGON, by and through
the STATE OF OREGON DEPARTMENT
OF ENVIRONMENTAL QUALITY; LEAH
FELDON, Director, State of Oregon
Department of Environmental Quality, in her
official and personal capacities; RICHARD
WHITMAN, Former Director, State of Oregon
Department of Environmental Quality, in his
personal capacity; and PENNY ROBERTSON,
Human Resources Manager, State of Oregon
Department of Environmental Quality, in her
official and personal capacities,

       Defendants.
_____

RUSSO, Magistrate Judge:

     Defendants the State of Oregon, Leah Feldon, Richard Whitman, and Penny Robertson

move to partially dismiss plaintiff Danielle Johnson's complaint pursuant to Fed. R. Civ. P.

12(b)(6). For the reasons stated below, defendants' motion is granted in part and denied in part.

**BACKGROUND**

Page 1 – FINDINGS AND RECOMMENDATION

Plaintiff is employed by the Oregon Department of Environmental Quality ("DEQ") as a Procurement and Contract Specialist. She identifies as a Caucasian female.

In October 2018, DEQ hired plaintiff in the Land Quality Division, Environmental Cleanup, and Emergency Response Program at DEQ's Portland, Oregon headquarters. Compl. ¶¶ 9, 22 (doc. 1). Plaintiff "holds a Master of Business Administration degree and several advanced certifications in the field of public procurement and contract administration"; her "job duties do not include" any legal tasks or work. *Id.* at ¶¶ 21, 23; Compl. Exs. 2-3 (doc. 1).

At some unspecified time, DEQ "promoted Ms. Johnson to the role of Lead Worker for her team." Compl. ¶ 32 (doc. 1). While "not a formal change in civil service job classification, this promotion included real increases in responsibility and visibility with higher-level managers, [and] a five percent pay increase." *Id.*

In the summer of 2020, plaintiff alleges that DEQ began "radically . . . advanc[ing] an unrelated social agenda sometimes known as 'Diversity, Equity and Inclusion' or 'DEI.'" *Id.* at ¶ 2. In other words, "DEQ's leadership" – i.e., Whitman (DEQ's former Director) and Feldon (DEQ's current Director) – "transformed the agency into one that exists in large measure to dole out government jobs and other benefits on the basis of race." *Id.* at ¶¶ 11, 12, 36-37. Notably, Whitman and Feldon adopted, or re-adopted, an "Affirmative Action Plan," which contains the following policy statement:

> The Department of Environmental Quality is committed to a policy and practice of Equal Employment Opportunity, from recruitment through the end of the employment relationship, DEQ respects its applicants and employees and does not discriminate based on race, religion, national origin, age, gender, sexual orientation, marital status, disability, or veteran's status.
>
> DEQ is committed to continued enforcement of the agency's 2015 strategic goals (see Appendix C) which promote affirmative action by: sustaining a diverse, outcome-oriented workforce and culture; developing an engaged, energized, and diverse workforce; adopting a culture of strategic thinking and continuous

improvement; maintaining informed and engaged relationships with tribes and Oregon's communities; and proactively engaging with people and communities where they live, work, and play . . .

DEQ expects each employee to promote a work climate reflecting respect, care and concern for every individual and to welcome employees who bring diversity into the workplace. Only by embracing the variety of cultures embodied by Oregon's citizens can DEQ provide the best possible service to those citizens and to the state of Oregon. DEQ continues to strive to improve the lives of those living within its borders, and will continue to improve as the agency moves forward.

DEQ believes diversity makes good business sense, The Affirmative Action Plan identifies goals that will help develop and maintain a workforce that reflects Oregon's demographics, encourages career development and employee advancement, and provides employees with the tools necessary to serve a more diverse customer base.

*Id.* at ¶¶ 37-38; Compl. Ex. 4, at 7 ([doc. 1-4](doc. 1-4)).

According to plaintiff, this policy "show[s] a significant bias against white applicants" insofar as "DEQ will seek to hire and promote a workforce that 'reflects the demographics of Oregon.'" Compl. ¶ 38 ([doc. 1](doc. 1)); *see also id.* at ¶ 39 (prior to 2020, each demographic "group's representation in DEQ's candidate pool and representation among those actually hired by DEQ was minimal, ranging [from] 0.2% for veterans to about 4% for Hispanic/Latino applicants [except for] white applicants whose representation among those hired by DEQ was almost 10% less than in the applicant pool") (citing Compl. Ex. 4, at 9 ([doc. 1-4](doc. 1-4))).

Also in the summer of 2020, DEQ instructed "staff, first in a trickle of communications, and then in a torrent, that their job responsibilities now included a duty to 'advance' DEI goals, including, most fundamentally, the goal of decreasing the proportion of white employment and increasing the proportion of non-white employment . . . whenever an opportunity presented itself, [staff] were expected to advance the interests of non-white applicants and employees [through hiring or mentorship] at the expense of anyone who had 'experienced white privilege,' meaning

anyone categorized as white." *Id.* at ¶¶ 47-51. "[A]ll staff" were expected to be engaged in "these DEI-oriented instructions." *Id.* at ¶ 52.

"Whitman announced via agencywide emails that DEQ would increase its focus on the alleged responsibility to 'address historic inequities and injustices' in society writ large through hiring and promotional practices that reduced white employee representation in favor of non-white representation." *Id.* at ¶ 41. As part of those efforts, DEQ started to offer "an hour per week, 'on work time' to enter into so-called 'safe spaces,' set up exclusively for non-white employees." *Id.* at ¶ 42.

Additionally, Whitman engaged "an outside DEI consulting firm called 'Engage to Change'" to "facilitate[e] 'anti-racist' training, and subsequently to develop human resources policies and other policies for adoption by DEQ." *Id.* at ¶ 44. As part of those trainings, DEQ disseminated written materials that plaintiff characterizes as ascribing "highly pejorative stereotypical character attributes and behaviors to 'whiteness.'" *Id.* at ¶ 60. The first of these documents was authored by Tema Okun,[1] an individual who identifies "as an upper class cisgender white woman," and outlines fifteen characteristics of "white supremacy culture" that "can show up in any group or organization, whether it is white-led or predominantly white or people of color-led or predominantly people of color." *Id.*; Compl. Ex. 6, at 1-6 (doc. 1-6); Compl. Ex. 7, at 6 (doc. 1-7). The second is "an Organizational Assessment ('OA') created by Engage to Change" that was "designed to provide insight, analysis, and recommendations to support DEQ in alignment of its

---

[1] "White supremacy culture" is a term coined by Ms. Okun in 1999 and describes the widespread ideology that whiteness holds value and is baked into the beliefs, values, norms, and standards of culture and political institutions. Compl. Ex. 7, at 1-6 (doc. 1-7). As the exhibits attached to plaintiff's complaint make clear, "white supremacy culture" is not meant to describe all white people but rather the norms of white middle-class and owning-class culture, nor is it meant to limit the discussion to race, although race is a foundational component.

mission and goals with its commitment to racial and social justice." Compl. ¶ 62 (doc. 1); Compl. Ex. 5, at 5 (doc. 1-5).

In October 2020, Engage to Change held a DEQ training, during which "facilitators repeatedly blamed societal inequities on 'structural racism,' and similar negative tropes detailed [in Ms. Okun's article]." Compl. ¶¶ 72-73 (doc. 1). "They further repeatedly instructed DEQ employees to 'elevate,' or give heightened credence to, the voices of non-white employees." *Id.*

In September 2022, Robertson (DEQ's Human Resources Manager) "made discrete changes in hiring and promotional procedures with the explicit intention of 'elevating' non-white applicants and promotion-seekers" by reducing the role of "the people in the agency most knowledgeable about the requirements of the job being filled" in the hiring process. *Id.* at ¶¶ 13, 53-55.

In June 2023, "DEQ disseminated [the OA and] all employees were required to read, absorb, and put [it] into practice." *Id.* at ¶ 62. The OA expressly incorporated Ms. Okun's fifteen characteristics of "white supremacy culture," as well as espoused the following statements that allegedly "denigrate some employees on the basis of their race":

● "White folks are unconsciously invested in racism."

● "White fragility" exists – i.e., a "state in which even a minimum amount of racial stress becomes intolerable for white people, triggering a range of defensive moves [including] the outward display of emotions such as anger, fear, and guilt, and behaviors such as argumentation, silence, and leaving the stress-inducing situation. These behaviors, in turn, function to reinstate white racial equilibrium."

● "My unexamined perspective is equal to people of color's."

● "As a white person I know the best way to challenge racism."

● "If I can't see it, it isn't legitimate."

● "I am superior."

*Id.* at ¶¶ 63-66 (quoting Compl. Ex. 5, at 23, 25, 155 (doc. 1-5)) (internal quotations and brackets omitted).[2]

Plaintiff interpreted this messaging to reflect DEQ's perspective that: (1) "'whiteness' had infected DEQ and was responsible for allegedly inappropriate outcomes in hiring and promotions"; and (2) "white employees suffer from defects not only of character and morals, but also of intellect and understanding." *Id.* at ¶¶ 62, 67; *see also id.* at ¶¶ 85-90 ("DEQ employees knew that the official policy of DEQ was that 'whiteness' consisted of a number of negative traits . . . in DEQ's view, even the impulse to question the tenets of so-called 'anti-racism' was itself 'racist' and would brand the questioner as unfit to serve the people of Oregon as a government servant," and it was "commonplace" for DEQ employees to express the sentiments outlined in Ms. Okun's and Engage for Change's work).

On July 11, 2023, Engage to Change held another meeting via videoconference. *Id.* at ¶¶ 99, 101. Feldon instructed all DEQ employees to sit in on that session and endorsed the OA. *Id.* at ¶ 100. Approximately 150 employees attended, including plaintiff. *Id.* at ¶ 101. In addition to repeating the rhetoric of the OA and Ms. Okun, facilitators also asserted that:

- "folks of color know whiteness better than white folks know whiteness."

- "acting frantically and being out of control was tightly connected to whiteness"

- "white people are incapable of listening to others."

- "white folks [are] morally inferior with respect to being able to judge whether their language was harmful."

---

[2] The majority of these statements occur in the context of a chart entitled, "Unhealthy Patterns When Receiving Feedback" that is intended to provide examples of ways to engage with the OA and facilitate a productive conversation about Engage to Change's work. Compl. Ex. 5, at 14-25 (doc. 1-5).

● "non-white employees should be paid additional amounts to compensate for doing the invisible labor of being non-white, which (in his view) necessarily implies spending time and effort to counter and dismantle whiteness in the workplace."

*Id.* at ¶¶ 102-05 (internal quotations omitted).

Plaintiff alleges that, "[i]n a non-combative and respectful way," she questioned "whether it was legal to deliberately treat people differently based on their race or any other protected class status in employment decisions? She also asked if the 'anti-racism work' promoted by DEQ and Engage to Change required ignoring some laws." *Id.* at ¶ 107 (internal quotations omitted). Defendants "turned the question back on" plaintiff, to which she responded: "she did not believe it was legal for the government to treat people differently based on their race." *Id.* at ¶ 108. "She further noted that, to the extent that DEQ might seek to justify its discrimination on the basis that it would 'make up for' past discrimination by the ancestors of (some) current white employees against the ancestors of (some) current non-white employees, the law did not support DEQ's position." *Id.*

Plaintiff's comments were not well-received; the facilitator stated that the "laws . . . were not just" but plaintiff continued to publicly press her views, which the facilitator deemed "resistance" and "asserted [that her] discourse caused trauma to non-white participants." *Id.* at ¶¶ 112-14 (internal quotations omitted). The facilitator then "created race-segregated breakout rooms for further discussion, and explicitly forbade white employees from joining any of these breakout rooms . . . audibly laugh[ing] at the idea that any white employees might 'feel excluded' by this move." *Id.* at ¶ 115. Plaintiff additionally alleges she was "belittl[ed]" and "attack[ed]" by the facilitator in an unspecified manner. *Id.* at ¶ 114.

The conversation eventually turned to identifying techniques to interrupt "anyone who raised issues like the ones Ms. Johnson asserted" and discussed "how DEQ's managerial

leadership should react to employees like Ms. Johnson in order to set an example that would deter

further communication, lest it 'harm' listeners." *Id.* at ¶ 116. Robertson interjected that plaintiff's

comments "caused 'harm,' especially to her 'HR team.'" *Id.* at ¶ 117.

The following day, plaintiff's direct supervisor, Ned Fairchild, emailed her:

> I heard from several people that there was a pretty intense exchange that you were
> a part of during the OA presentation yesterday. I was not there for the exchange,
> but joined the call shortly afterward. I would like to discuss it from your perspective
> at our check-in this afternoon.

*Id.* at ¶ 118; Compl. Ex. 8, at 5-6 ([doc. 1-8](#)). Plaintiff responded:

> Yeah, it seemed like some people were upset by my questions "Is it legal to
> deliberately treat people differently based on their race (or any other protected class
> status) in employment decisions?" and "Does anti-racism work require ignoring
> some laws?" And, in response to Leela's response to my questions that "the status
> quo is people from marginalized groups are already treated differently in spite of
> the law, this is what we are trying to change," my question "Is that advocacy of
> illegal conduct?"
>
> I was genuinely curious if I was missing something that somehow makes the anti-
> racism efforts Engage to Change was advocating legal. They didn't directly answer
> my questions. Instead, Rakeem questioned whether all laws are just and equitable
> (including clearly discriminatory laws that were long ago overturned through legal
> processes), and suggested we already have preferences for whiteness in society
> because there is disproportionate representation in every institution in the country
> – as if to suggest that giving preferences for non-whiteness should therefore be
> acceptable to "correct" the disproportionality, even if doing so is illegal. I indicated
> I thought it was <u>as</u> absurd to assume that the <u>only</u> explanation for disproportionate
> representation by skin color is discrimination, as it is to assume that the <u>only</u>
> explanation for disproportionate representation by hair color or eye color (or any
> other characteristic) is discrimination. I pointed out that correlation does not prove
> causation. And I suggested that there is a process to go about changing unjust laws
> (if enough people agree the laws are unjust). I think going through that process
> would be preferable to DEQ ignoring or not abiding by existing anti-discrimination
> laws in employment decisions.
>
> Kasia then opened up affinity spaces (breakout rooms) for all of the people who
> were hurt by my questions and comments.
>
> A revealing comment in chat was, "Legality shouldn't be the measure of whether
> something is okay or not when it comes to issues revolving racism. Slavery was
> legal, segregation was legal, red lining was legal. Why is there such a focus on

legality?" The commenter seemed to suggest our country's current anti-discrimination laws aren't "okay" and we shouldn't be focusing on whether it's legal or not to do what's "right." It was followed by the comment, "Would DEQ adopt an OA that asks their employees to behave illegally? This is a clear dog whistle. Period." However, that's exactly what I'm concerned about.

As a management services employee, my understanding is that I am held to a higher standard of ethics. When I see something that appears to be advocating for illegal conduct, I feel compelled to ask about it and bring it to others' attention so that it can be explored and hopefully resolved. Ideally, we would all be reassured that DEQ intends to follow the letter of the law, even if that doesn't result in racial proportional representation because, as the Supreme Court stated in the SFFA case, "[O]utright racial balancing" is "patently unconstitutional."

I'm not sure I'll have much more to add when we meet, but we can start with that.

Compl. Ex. 8, at 4-5 ([doc. 1-8](#)) (emphasis in original).

She then provided a follow-up email after her previously scheduled meeting with Mr.

Fairchild:

Here's the article I mentioned in our check-in today that discusses how, <u>even if</u> an employer has an "approved" affirmative action plan (AAP) because they've had a past finding of illegal discrimination (which the City of Omaha had – I don't know if DEQ has [an] approved AAP, but I don't think so especially because the 21-23 plan was a "draft" plan), they cannot give preference based on race or gender to try to achieve placement goals in an effort to remedy the past discrimination. The author states (underlines all mine):

"*[I]t would be a good time to refresh managers' recollections that it is <u>never</u> acceptable to make any employment decisions based on race or gender. The setting of a placement goal in an affirmative action plan means that recruiters have an added burden to try to ensure that applicant pools contain sufficient percentages of qualified women and minorities; it does not give a manager justification to hire someone because he or she is a minority, even if there is a goal in the job group. At all times, the most qualified person must be selected for the position, <u>without regard to</u> race, gender or any other protected category.*" This sentiment is echoed in CFR 60-2.16(e) (which is worth the quick read).

And here's the CFR 1607.17 Policy statement on affirmative action I mentioned. It is "*intended to assist State and local governments by illustrating the kinds of analyses and activities which may be appropriate for a public employer's <u>voluntary</u> [not "approved"] affirmative action plan.*" It states, "*The first step in the construction of any affirmative action plan should be an analysis of the employer's work force to determine whether percentages of sex, race, or ethnic groups in*"

*individual job classifications are substantially similar to the percentages of those groups available in the* <u>relevant job market</u> *who possess the basic job-related qualifications.*" And "*The goal of any affirmative action plan should be achievement of genuine* <u>equal employment opportunity</u> *for all qualified persons. Selection under such plans should be based upon the ability of the applicant(s) to do the work. Such plans should not require the selection of the unqualified, or the unneeded, nor should they require the selection of persons on the basis of race, color, sex, religion, or national origin.*"

DEQ's AAP does not analyze DEQ's workforce in individual job classifications and then compare the race/sex/ethnic percentages to the race/sex/ethnic percentages available in the relevant job market who possess the basic job-related qualifications. Instead, manager demographic goals are based on the population of existing DEQ staff, aiming to have the demographics of management at DEQ proportionally match the demographics of the pool of all DEQ staff. And staff demographic goals are based on the demographics of the workforce population of Oregon, aiming for proportional representation. These goals are inappropriate and discriminatory because the demographics of the workforce population of Oregon do not proportionally match the demographics of the pool of qualified candidates in the relevant job markets for each of the individual job classifications. The above policy statement on AA suggests goals should be aiming for equal employment opportunity, not equitable employment outcomes (because, as the Supreme Court noted in the SFFA cases, racial balancing is unconstitutional).

This information, along with information presented in the DEQ Organizational Assessment and the OA Presentations, is what led me to ask my questions about the legality of anti-racism and equity work. If the goal of anti-racism work is to achieve racial equity (i.e., racially proportional representation, as highlighted in the opening paragraph of the "Reimagining HR" section of the OA on p. 100), but racially proportional representation relative to society as a whole can only be achieved through illegal, discriminatory practices, then what does that mean for DEQ? How does DEQ achieve racial justice (as defined in the OA on pp. 146-147) if providing "deliberate systems and support to achieve and sustain racial equity through proactive and preventative measures" is unconstitutional? What is the implication for our constitution?

I would welcome a response from leadership.

*Id.* at 3-4 (emphasis in original). Mr. Fairchild replied:

If you would like I will pass along your comments to leadership, as I am neither a lawyer nor an HR professional I do not feel I can speak authoritatively on the substance of your comments.

I do want to respectfully acknowledge to you that I do not personally share your interpretations or conclusion on this topic.

Page 10 – FINDINGS AND RECOMMENDATION

In my (non-exhaustive) reading of both, I do not interpret anything in the OA or the 2021 – 2023 Affirmative Action Plan to be advocating for illegal or discriminatory practices. As an experienced hiring manager for DEQ I do not now, nor have I ever felt conflicted between my professional obligations and upholding the law.

The OA says of Racial Justice (to your quote): "It is not just the absence of discrimination and inequities, but also the presence of deliberate systems and supports to achieve and sustain racial equity through proactive and preventative measures." It seems to me that the absence of discrimination and inequities for all is foundational to the OA.

*Id.* at 2-3. Plaintiff went on to express her concern "that, like you, there are a lot of people at DEQ (and elsewhere) who aren't familiar with employment law . . . I would appreciate if you would please pass along my comments to DEQ leadership." *Id.* at 1. She then included language from "EEOC's Compliance Manual on Affirmative Action" for DEQ leadership's "consideration." *Id.*

On July 17, 2023, Feldon sent out the following email to DEQ staff:

I want to acknowledge and express my concern and regret over two recent public incidents that have shown our agency has much work to do ahead of us as we move toward a workplace culture that embraces anti-racism and equity. These incidents demonstrate the very real harm that occurs regularly to our BIPOC (Black, Indigenous and People of Color) employees, and our white colleagues who are part of marginalized communities.

A few weeks ago, Water Quality staff were subject to a racist and antisemitic diatribe that was inadvertently broadcast during an online training session. This incident has prompted ongoing conversations about the timeliness of DEQ's response and will be the topic of a facilitated discussion on Aug. 2.

Last week, during a well-attended session to discuss the recently released Organizational Assessment, participants witnessed aggressive resistance to the insight and analysis contained in the assessment, rather than open, thoughtful inquiry to promote understanding. Consultants from Engage to Change, who produced the assessment and facilitated the meeting, interrupted the dialog with respectful feedback to the speaker. Nonetheless, staff who were seeking an earnest conversation about the assessment were subjected to hurtful comments. To be clear, curiosity, questions and sharing of feelings about the assessment are welcome, but as we move into this work, we must think about others in the room and how our comments may feel for them. We must strive to do our learning in places and manners that do not continue harm.

Both of these cases are public examples of what DEQ BIPOC employees experience in often non-public ways, and we can and must learn from these instances.

I and the DEQ Leadership Team are currently engaged in reading and absorbing the Organizational Assessment. Among its lessons is the self-reflection required for progress to be made. For those who witnessed these two incidents described here, and those who may have heard about them, it is a good time to look inwards and think about the impact on yourself and your colleagues. For those who were harmed, I am sorry.

The Leadership Team will continue discussing the OA in upcoming meetings and will start looking at the recommendations provided by the ETC. It is too early in the process to begin outlining what the next steps will be for DEQ, other than to encourage continued conversations about the OA content. My commitment to you is to keep you informed as we proceed with this difficult but necessary work.

Compl. ¶ 125 (doc. 1); Compl. Ex. 9 (doc. 1-9).

On July 31, 2023, Robertson "stripp[ed] [plaintiff] of her Lead Worker position" and correspondingly cut her "pay by five percent." Compl. ¶¶ 127-28 (doc. 1). Robertson "also initiated a so-called 'investigation' into whether Ms. Johnson had caused 'harm' when she" spoke at the July 11 meeting. *Id.* at ¶ 129. And since that time, plaintiff's "supervisor has refused to provide her with formal performance reviews, in violation of DEQ policies and practices." *Id.* at ¶ 131.

On August 8, 2023, "while the sham investigation was ongoing, Plaintiff filed an internal complaint with the Oregon Department of Administrative Services ('DAS') [stating] that Defendants' conduct in response to Plaintiff's protected July 2023 speech was retaliatory, among other things." *Id.* at ¶ 140; *see generally* Compl. Ex. 10 (doc. 1-10). As a result of plaintiff's filing, defendants and DAS combined their investigations. Compl. ¶ 141 (doc. 1).

On February 5, 2024, DAS issued a letter, which specified, in relevant part:

[T]he investigation is now complete and the complaint was found to have merit. Specifically, the allegation that the suspension of your lead duties and pay pending this investigation constituted technical retaliation for engaging in protected conduct during a July 11, 2023, online meeting, though no punitive motivations or individual management misconduct were present.

At this meeting, representatives of an outside consultant, Engage the Change (ETC), discussed an organizational assessment document prepared by ETC. Approximately 150 DEQ employees, including you, attended this online meeting. During this meeting, you raised a question in the comments about the legality of anti-racism work and the presenter invited a conversation with you on this subject. This exchange occurred in the presence of all online attendees.

The investigator determined that the decision makers' purpose in suspending your lead duties pending an investigation into the matter was to make sure staff under your leadership wouldn't suffer additional harm. That was a legitimate managerial purpose. With no evidence that the decision-makers had malicious or even retaliatory underlying motivation, this investigation finds that the decision makers engaged in no misconduct.

The investigation did not support substantiated findings that Director Feldon engaged in an act of retaliation with her July 17, 2023, email. The investigation also did not support substantiated findings that your suspension of lead duties constituted religio[us] discrimination or retaliation for your EEOC filing. Finally, the investigation did not find that your conduct during the July 11, 2023, online meeting constituted a violation of the professional workplace policy.

While privacy considerations limit our ability to share confidential information with you about other employees, I can communicate the agency has taken appropriate action to compensate you retroactively for the period your lead duties were suspended. Your March 1, 2024, paycheck should reflect this payment and you will resume your lead worker duties from this point forward.

*Id.* at ¶ 142; Compl. Ex. 11 (doc. 1-11). Plaintiff was thus returned to her Lead Worker position

after approximately six months.

On February 12, 2024, plaintiff initiated this lawsuit alleging the following claims:

(1) retaliation in violation of the First and Fourteenth Amendment against Feldon and Robertson;

(2) retaliation in violation of Title VII against Feldon, Robertson, and DEQ; (3) retaliation in

violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against Feldon and Robertson; (4) retaliation

in violation of Or. Rev. Stat. § 659A.030(1)(f) against Feldon, Robertson, and DEQ; (5) retaliation

in violation of Or. Rev. Stat. § 659A.199 against Feldon, Robertson, and DEQ; (6) hostile work

environment in violation of Title VII against all defendants; (7) hostile work environment in

violation of 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against Feldon, Robertson, and Whitman; and

(8) hostile work environment in violation of Or. Rev. Stat. § 659A.030 against all defendants. *See generally* Compl. (doc. 1).

Plaintiff seeks myriad forms of equitable relief, as well as monetary damages. In particular, plaintiff requests preliminary and permanent injunctions:

- "prohibiting Defendants from retaliating against Plaintiff or any other DEQ employee for exercising his or her right to protected speech";

- "prohibiting Defendants from discriminating on the basis of race in any aspect of employment";

- "requiring Defendant DEQ to implement a rigorous policy protecting employees' First Amendment rights and to provide meaningful training to all DEQ supervisory and managerial employees regarding employees' rights to freedom of expression and freedom of speech"; and

- "requiring Defendant DEQ to cover the simple interest that Ms. Johnson could have accrued, if she had been paid her Lead Worker salary during the course of the sham investigation, such that she is made whole in terms of her salary."

*Id.* at pgs. 45-46 (doc. 1).

On May 28, 2024, defendants filed the present motion to dismiss. Briefing was completed in regard to that motion on July 17, 2024.

## STANDARD OF REVIEW

Where the plaintiff "fails to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For the purposes of a motion to dismiss, the complaint is liberally construed in favor of the plaintiff and its allegations are taken as true. *Rosen v. Walters*, 719 F.2d 1422, 1424 (9th Cir. 1983). Regardless, bare assertions that amount to nothing more than a "formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009). Rather, to state a plausible claim for relief,

Page 14 – FINDINGS AND RECOMMENDATION

the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Bacca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## DISCUSSION

Defendants argue: (1) "Feldon and Robertson [should be dismissed] from [the] Second Claim [as they are] not . . . appropriate defendants" under Title VII; (2) the Eleventh Amendment bars "the Fourth, Fifth and Eighth Claims"; (3) "the Sixth and Seventh Claims [fail] to state a claim"; and (4) "the Prayers for hypothetical prospective injunctive relief and pre-judgment interest" should be stricken because "the Complaint relate[s] to retrospective events only," and "[p]re-judgment interest is punitive and the State, not having explicitly waived its sovereign immunity, may not be charged with such liability." Defs.' Partial Mot. Dismiss 2, 6, 10-11 (doc. 19). Alternatively, defendants contend that, pursuant to Or. Rev. Stat. § 30.265, "the State of Oregon Department of Environmental Quality [should be substituted] for the individual defendants in each of the Third, Fourth, Fifth, and Eighth Claims." *Id.* at 2.

Plaintiff "does not object to dismissal of the second claim . . . against defendants Feldon and Robertson." Pl.'s Resp. to Partial Mot. Dismiss 30-31 (doc. 27). She likewise "does not object to dismissal of her fourth, fifth and eighth causes of action as against DEQ and individual defendants Feldon and Robertson in their official capacities, pursuant to the Eleventh Amendment."[3] *Id.* at 31 n.8. Additionally, as plaintiff acknowledges, the prayer for relief seeks

---

[3] Plaintiff does broadly assert that, "to the extent that [her] fourth, fifth and eighth claims for relief seek damages against defendants Feldon, Robertson, and Whitman in their individual capacities, the Eleventh Amendment does not apply and the claims should be allowed to go forward." Pl.'s Resp. to Partial Mot. Dismiss 31 (doc. 27). Yet plaintiff does not identify any facts showing personal liability does or should exist in relation to the individually named defendants. Indeed, as defendants accurately denote, "[t]here is no allegation in the Complaint that any individual defendants acted outside the scope and course of their duties." Defs.' Partial Mot. Dismiss 9 (doc. 19); *see also Justice v. Rockwell Collins, Inc.*, 117 F.Supp.3d 1119, 1134 (D. Or. 2015), *aff'd*, 720 Fed.Appx. 365 (9th Cir. 2017) ("if a party fails to counter an argument that the opposing party

pre-judgment interest solely "'as authorized by law,'" and it is well-established that such interest "is not to be awarded" in this context unless the state stipulates by contract or "the legislature waives the state's sovereign immunity" (neither of which appears to have occurred in this case). Pl.'s Resp. to Partial Mot. Dismiss 33 n.9 (doc. 27); *Newport Church of Nazarene v. Hensley*, 335 Or. 1, 17, 56 P.3d 386 (2002).

Lastly, plaintiff is correct "this District [has] routinely held that, absent the allegation of a specific dollar amount equal to or less than the required amount, defendants may not rely on ORS 30.265(3) to compel substitution of a public body in place of individual defendants."[4] Pl.'s Resp. to Partial Mot. Dismiss 32 (doc. 27) (quoting *Monson v. Oregon*, 2023 WL 6174382, *2 (D. Or. Sept. 22, 2023)); *see also Flores v. Or. Dep't of Corr.*, 2024 WL 2300771, *6 (D. Or. May 21, 2024) ("under the current version of Oregon Revised Statutes § 30.265, whether the State of Oregon is the only proper defendant for Flores' state law tort claims depends on the amount of damages Flores seeks"). With the clarification of those issues, the Court now turns to the parties' remaining disputes.

_____

makes . . . the court may treat that argument as conceded") (citation and internal quotations and brackets omitted). Stated differently, in order to proceed, "[p]laintiff must [first] specify the acts each named individual Defendant committed which are outside their delegated duty." Defs.' Reply to Partial Mot. Dismiss 4-5 (doc. 29); *see also Cato v. Diaz*, 2021 WL 11492350, *3 (E.D. Cal. July 28, 2021) ("[t]he Supreme Court has ruled that the real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading . . . courts must still analyze the specifics of the conduct involved when determining whether a suit is against an official in his or her 'official' or 'individual' capacity") (citations and internal quotations and brackets omitted).

[4] The Court acknowledges defendants' position that the omission "the dollar amount of damages claimed against the individual law claims" is a "violation of ORCP 18," such that they intend to "renew their motion requiring substitution" once plaintiff "complies with Oregon law to sustain a claim governed by the Oregon Tort Claims Act." Defs.' Reply to Partial Mot. Dismiss 7 (doc. 29).

I.    **Federal Hostile Work Environment Claims**

To state a hostile work environment claim under Title VII or 42 U.S.C. § 1981, a plaintiff must show: "(1) she was subjected to verbal or physical conduct because of her race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (citation and internal quotations omitted). To satisfy the third element, the conduct complained of must be both objectively and subjectively hostile or abusive. *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007) (citation and internal quotations omitted).

In making the objective determination, the court evaluates the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (citations and internal quotations omitted). "The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (citation and internal quotations omitted).

Initially, although plaintiff makes myriad allegations surrounding the work culture at DEQ following the introduction of the DEI written materials and trainings (and how that negatively impacted her), the majority of these are vague and/or conclusory. *Cf. McKeon v. Cent. Valley Cmty. Sports Found.*, 2018 WL 6436256, *4 (E.D. Cal. Dec. 7, 2018) ("Plaintiffs must allege more than generic and conclusory allegations demonstrating that 'Defendants' collectively engaged in [misconduct] and allege with at least some degree of specificity the acts which each defendant is alleged to have engaged in which support Plaintiff's claims") (citations omitted).

Without such facts, the premise that Whitman and/or Feldon sought to transform the DEQ into an agency "that exists in large measure to dole out government jobs and other benefits on the basis of race" is not plausible, especially considering that the materials attached to the complaint intimate defendants were committed to achieving equality in the workplace through legal means. Compl. ¶ 36 (doc. 1); *see also Iqbal*, 556 U.S. at 682 (an allegation is not plausible where there is an "obvious alternative explanation" for the alleged misconduct) (citation and internal quotations omitted). This does not necessarily mean that defendants did not violate the law or discriminate against plaintiff. The Court is simply unable to conclude, based on the broad policy statements and allegations proffered by plaintiff, that DEQ fostered a workplace replete with insidious discrimination and illegal hiring practices.

Furthermore, exposure to DEI training materials discussing concepts such as "structural racism" and "white privilege" are alone insufficient to establish a hostile work environment claim for two reasons. First, there are no well-plead facts indicating that any race-based comments or behaviors were directed specifically towards plaintiff, or that she experienced any concrete and particularized injury until after she spoke at the July 11 meeting. *Cf. Manatt*, 339 F.3d at 798 (granting summary judgment in favor of the defendant on a hostile work environment claim where there were "only a couple of occasions [the plaintiff's] co-workers or supervisor direct[ed] their racially insensitive" comments towards her over a two-and-a-half year period); *see also Sharpe v. Primex Garden Ctr.*, 2024 WL 3161755, *2, 7 (E.D. Pa. June 25, 2024) (in the context of claims surrounding new workplace initiatives that allegedly favored "people who were historically oppressed[,] comment[s] not made directly to the plaintiff [are] less likely to cause a court to consider harassment to be pervasive") (citations and internal quotations omitted). And, while plaintiff characterizes her comments at that training as "non-combative and respectful," and

limited to the issue of whether "it was legal to deliberately treat people differently based on their race," her contemporaneous emails to Mr. Fairchild suggest she collectively made statements that could objectively be construed as not anti-racist.[5] Compl. ¶ 107 (doc. 1).

Second, and relatedly, "compar[ing] diversity trainings" that use terms such as "'racial bias,' 'white man's privilege,' and 'white man's guilt,' and address topics such as systemic racism, oppression, and intersectionality . . . to true hostile work environments . . . trivializes the freedom protected by Title VII." *Honeyfund.com, Inc.*, 622 F.Supp.3d at 1171, 1186 (citations and internal quotations omitted). To be sure, "a diversity and inclusion training could be so offensive, and so hostile to White employees, that it could create a hostile work environment." *Id.* at 1179; *see also De Piero v. Pa. State Univ.*, 2024 WL 128209, *8, -- 698 F.Supp.3d -- (E.D. Pa. Jan. 11, 2024) ("[w]hen employers talk about race – any race – with a constant drumbeat of essentialist, deterministic, and negative language, they risk liability under federal law") (internal citation omitted).

But this Court simply cannot conclude that passive exposure to the aforementioned language and concepts constitutes racial discrimination. *Cf. De Piero*, 2024 WL 128209 at *7-8 (it is "the way these conversations are carried out in the workplace [that] matters . . . [t]raining on concepts such as 'white privilege,' 'white fragility,' implicit bias, or critical race theory can

---

[5] As other courts have recognized, it is difficult to objectively "discuss . . . concepts rooted in historical phenomena, like systemic racism, critical race theory, white privilege, and male privilege." *Honeyfund.com, Inc. v. DeSantis*, 622 F.Supp.3d 1159, 1183-84 (N.D. Fla. Aug. 18, 2022), *aff'd*, 94 F.4th 1272 (11th Cir. 2024). However, structural racism and implicit bias are, at this point in time, well-documented facets of American society (and the subject of much academic study and literature), even if they remain divisive concepts within certain communities. *See, e.g.*, *LA Alliance for Human Rights v. Cnty. of L.A.*, 14 F.4th 947, 952 (9th Cir. 2021); *see also United States v. Modeste*, 2023 WL 2986933, *3 (D. Ala. Apr. 18, 2023) ("[t]he Court acknowledges that racism is deeply embedded in systems, laws, written or unwritten policies, and entrenched practices and beliefs that produce, condone, and perpetuate widespread unfair treatment and oppression of people of color") (citation and internal quotations omitted).

contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment"); *see also Norgren v. Minn. Dep't of Hum. Servs.*, 2023 WL 35903, *4 (D. Minn. Jan. 4, 2023), *aff'd*, 96 F.4th 1048 (8th Cir. 2024) ("Norgren alleges that he endured months of reviewing weekly communications and videos sent by DHS that contradicted his view of equality, and that he was forced to retire early due to the hostile work environment resulting from his opposition to the anti-racism training [but] [r]equiring all employees to undergo diversity training does not amount to abusive working conditions") (citation and internal quotations omitted).

Indeed, as defendants observe, courts that have grappled with this issue have "required more than exposure to DEI materials in the workplace to maintain an action for hostile workplace." Defs.' Partial Mot. Dismiss 8 (doc. 19) (citing *Young v. Colorado Dep't of Corr.*, 94 F.4th 1242 (10th Cir. 2024); *Diemert v. City of Seattle*, 689 F.Supp.3d 956 (W.D. Wash. 2023); and *De Piero*, 2024 WL 128209).

In *Young*, the plaintiff alleged that facilitators of a series of mandatory trainings "made sweeping generalizations about white individuals which indicated that the workplace is permeated with discrimination, ridicule, and insult," and encouraged him to review additional reading materials that "contain[ed] outright support for forms of invidious race discrimination masquerading as 'anti-racist' literature." *Young*, 94 F.4th at 1251 (internal quotations omitted). The training videos "had one of the interviewees using the N-word in the context of describing discriminatory housing practices," advised "trainees to be careful of exclusionary 'white norms,'" and "critique[d] 'white exceptionalism' [and] a 'fakequity' belief that 'white allies' are 'an exception to white racism.'" *Id.*

The district court dismissed his hostile work environment claim because the third prima facie element was not met:

> While Mr. Young asserts that he experienced severe and pervasive harassment, again he does not allege specific facts that demonstrate how the training related to his actual workplace experience. For example, he does not allege that the training occurred more than once, that his supervisors threatened to punish or otherwise discipline employees who failed to complete or agree with the materials, or that co-workers engaged in specific acts of insult or ridicule aimed at him because of the training.

*Id.* In so finding, *Young* emphasized that the typical hostile work environment claim was exemplified by work "environments permeated with race-based harassment" and "racially-abusive conduct, ridicule, and insult from both co-workers and supervisors." *Id.* at 1253. The plaintiff did not allege any comparable conduct and could "not rest only on the insults he experienced on the day he completed the EDI training," especially where there were no facts to suggest the existence of any "racial animus manifesting itself in Mr. Young's day-to-day *work environment*." *Id.* (emphasis in original).

In contrast, both *De Piero* and *Diemert* allowed hostile work environment claims to go forward. Yet, in those cases, the plaintiff alleged conduct beyond the EDI trainings themselves – namely, physical aggression and/or repeated and direct race-based comments from co-workers and supervisors. *See De Piero*, 2024 WL 128209 at *7 (the plaintiff alleged he had to attend five conferences/training sessions where facilitators "ascrib[ed] negative traits to white people or white teachers without exception and as flowing inevitably from their race," and during which "white faculty [where instructed] to 'feel the pain' that [George Floyd] endured in a breathing exercise" by "hold[ing] their breath just a little longer," among other specific examples; he "also document[ed] emails and interpersonal interactions from this time period," including direct comments from colleagues and supervisors that reflected that the "problem [is] the white race")

(internal quotations, brackets, and ellipses omitted); *Diemert*, 689 F.Supp.3d at 960-61 (the plaintiff alleged that multiple coworkers and managerial/director-level employees made direct statements to him about his race and, when he "reported his concerns [his supervisor] told him he should step down and that he used his white privilege to retain the position and that he was denying a person of color an opportunity for promotion"; the plaintiff's supervisor additionally "'chest bumped' him, got in his face, and told [him] he had white privilege and racist motives").

In sum, although none of these cases have precedential value, they all "stand for roughly the same settled and sound principle, which [is that] merely discussing the influence of racism on our society does not necessarily violate federal law." *Young*, 94 F.4th at 1253 n.4. And, to the extent persuasive, these cases indicate that a hostile work environment claim does not lie in the present case.

Significantly, plaintiff does not allege specific instances of verbal or physical assault, name-calling, or any other forms of abuse. Her complaint is solely about her disagreement with written DEI materials disseminated in the workplace, and which served as the backbone of two separate trainings over a three-plus year period. She maintains she was publicly accused by Feldon of engaging in "a racist . . . diatribe," but the plain language of the July 17, 2023, email cannot be read, even tacitly and drawing all reasonable inference in plaintiff's favor, to support such an allegation. *Compare* Compl. ¶ 125, *with* Compl. Ex. 9 (doc. 1-9); *see also Nietzche as Tr. for KRME Int'l Tr. v. Freedom Home Mortg. Corp.*, 2023 WL 2570417, *1 (9th Cir. Mar. 20, 2023) ("the court is not required to accept as true allegations that contradict exhibits attached to the Complaint[,] unwarranted deductions of fact, or unreasonable inferences") (citation and internal quotations omitted).

The Court understands that plaintiff perceived defendants' work environment as subjectively hostile, and accepts that her comments at the July 11 meeting were motivated by "good-faith curiosity." Compl. Ex. 10, at 2 (doc. 1-10); *see also* Compl. Ex. 12, at 3-6 (doc. 1-12) (plaintiff's administrative charge listing, among other instances, the following forms of religious discrimination: being asked to share her gender pronouns, DEQ's "stated goal" of "develop[ing] and maintain[ing] a workforce that reflects the demographics of Oregon," "proselytizing emails from upper management and the DEQ Pride and BIPOC affinity groups, encouraging DEQ staff to become better allies to the LGBTQIA2S+ and BIPOC communities," and the use of "Pride logos" on DEQ "websites, emails, social media, and employee Teams backgrounds and email signature lines"). But the Court cannot conclude, based on the well-plead facts, that defendants' conduct was sufficiently severe or pervasive enough to alter the conditions of plaintiff's employment and create an abusive working environment. Defendants' motion is granted as to plaintiff's sixth and seventh claims.

## II.    Requests for Injunctive Relief

The district court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000); *see also United States v. Streich*, 560 F.3d 926, 931 (9th Cir. 2009) ("[a] claim is not ripe if it involves contingent future events that may not occur as anticipated, or indeed may not occur at all") (citation and internal quotations omitted). Similarly, the Eleventh Amendment prohibits federal courts from issuing declaratory and injunctive relief against state officials when no continuing violation exists. *Green v. Mansour*, 474 U.S. 64, 67-69 (1985).

Whitman is the former Director of DEQ. Any claims against him necessarily concern only past conduct. *Cf. Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) ("a plaintiff requesting an injunction requiring her former employer to adopt and enforce lawful policies [lacks] standing to sue for injunctive relief"). Moreover, absent from the complaint are allegations that defendants continue to: (1) retaliate against plaintiff or other DEQ employees for exercising their free speech rights; (2) make discriminatory employment decisions based on anti-White sentiments; or (3) withhold any salary.[6] In other words, the requests for injunctive relief detailed above are speculative or pertain to retrospective events.

## RECOMMENDATION

For the reasons stated herein, defendants' Partial Motion to Dismiss (doc. 19) should be denied as to their alternative request pursuant to Or. Rev. Stat. § 30.265, and granted in all other respects. Plaintiff's request for oral argument is denied as unnecessary.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections

---

[6] Plaintiff maintains that "every single one of the practices [she] complains of continues to this day," as defendants have not stopped "their practice of discriminating on the basis of race in hiring, promotions, salaries, mentoring, and other aspects of employment"; "requiring employees to absorb and agree with their derogatory opinions concerning allegedly innate and immutable racial characteristics"; or "threatening retaliation against employees who engage in 'resistance' to these practices." Pl.'s Resp. to Partial Mot. Dismiss 32-33 (doc. 27). But, as discussed in Section I, the well-plead facts do not evince discriminatory employment practices related to plaintiff's race, nor any threats of retaliation for failing to absorb or agree with the DEI materials.

to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 13th day of August, 2024.


_____/s/ Jolie A. Russo_____
Jolie A. Russo
United States Magistrate Judge