James L. Kerwin*
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, Colorado 80227
303-292-2021
jkerwin@mslegal.org
*Admitted Pro Hac Vice

Herbert G. Grey, Attorney at Law
OSB No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005
503-641-4908
herb@greylaw.org

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### PORTLAND DIVISION

| | |
|---|---|
| DANIELLE JOHNSON,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF OREGON, by and through the STATE OF OREGON DEPARTMENT OF ENVIRONMENTAL QUALITY *et al*.<br><br>    Defendants. | No. 24-cv-00279-JR<br><br><br>**PLAINTIFF'S MOTION TO COMPEL DISCOVERY** |

**INTRODUCTION**

Plaintiff Danielle Johnson challenges the widespread, racially discriminatory practices of her employer, the State of Oregon Department of Environmental Quality ("DEQ"). She seeks injunctive relief to end these practices, and damages for a racially discriminatory workplace environment. Ms. Johnson also brings claims related to a series of events beginning on July 11, 2023, when she questioned the legality of DEQ's practices during a training session hosted by a Diversity, Equity and Inclusion ("DEI") contractor named Engage to Change ("ETC"). In response, Defendants retaliated against Ms. Johnson. All of these claims survived DEQ's Motion to Dismiss.

Yet Defendants have refused to produce documents related to DEQ's race-conscious efforts to affect employment outcomes, on the specious ground that no such documents "exist." They have refused to produce documents concerning DEQ "affinity groups," on the ground that they do not understand what an "affinity group" is. And while nominally agreeing to produce materials concerning DEQ's efforts to instruct employees to adopt the tenets of DEI, they have improperly limited their productions, and flat-out refused to search for relevant documents. Last, they have refused to produce documents that could show just how badly Ms. Johnson's professional reputation has been damaged by their retaliation. Plaintiff is entitled to prove the case that she pled. The Court should thus compel Defendants to respond to Plaintiff's document demands.

**BACKGROUND**

## I.     Plaintiff's Allegations

### A.     *Discriminatory Workplace Environment*

Plaintiff's employment with DEQ commenced in 2018. Dkt. 41, First Am. Compl. ("FAC") ¶ 22. As alleged, since at least that time, DEQ's leaders have focused more and more on "dol[ing] out government jobs and other benefits on the basis of race." *Id.* ¶ 36. DEQ acts under the banner of DEI, which, in DEQ's case, is a euphemism for three sets of policies: (1) efforts to re-balance its workforce and change the distribution of jobs, leadership roles, wages, and other tangible terms and conditions of employment along racial lines; (2) the maintenance of race-segregated programs; and (3) official teachings instructing employees to ascribe to each other attributes based on the color of their skin and to change their fundamental values. Each of these is an independent basis for a discriminatory workplace environment claim. Dkt. 27, Pl's Br. IOT Mot. to Dismiss at 13-22.

B.    *Retaliation Claim*

During a July 11, 2023 DEI training session, Plaintiff spoke up in opposition to Defendants' practices. She asked whether it was "legal to deliberately treat people differently based on their race . . . in employment decisions?"  FAC ¶ 107. Rather than engaging in a dialogue with Ms. Johnson, Defendants retaliated by accusing her of causing racial "harm," demoting her, cutting her pay, and subjecting her to a six-month "investigation." *Id.* ¶¶ 114, 125-30, 164(a). Adding insult to injury, Defendant Leah Feldon, the highest executive in the agency, sent a July 17, 2023 e-mail to every single DEQ employee that identified Plaintiff as an impediment to the agency's "anti-racism" efforts. *Id.* ¶ 125 & Ex. 9. The e-mail further equated Ms. Johnson's discussion at the DEI training session with a separate alleged "racist and antisemitic diatribe." *Id.* Although the e-mail did not identify Ms. Johnson by name, given that at least a hundred and fifty DEQ employees were present during the training and witnessed Defendants' strong reaction to Ms. Johnson's speech (including statements by Defendant Robertson, the head of DEQ's HR operation), the recipients of Ms. Feldon's e-mail knew that Ms. Johnson was the person being targeted. *Id.* ¶¶ 97 *et seq*.

## II.    The Motion to Dismiss

Defendants moved to dismiss the discriminatory workplace claims, but not the retaliation claims. Dkt. 19. In their motion, Defendants focused exclusively on the DEI instructional program and argued primarily that the complaint failed to sufficiently allege that racially hostile statements in DEQ's trainings and messaging were severe or pervasive enough to state a hostile work environment claim. *Id.* Plaintiff opposed the motion, noting that there are three distinct ways to show a discriminatory workplace environment: (1) concrete intentional acts of discrimination against persons of the same race as the plaintiff which, standing alone, can create a hostile environment even if the plaintiff is not a direct target of those acts; (2) racially-segregated programs or facilities; and (3) an employer expressing or tolerating the expression of racially hostile words, opinions, or views. Dkt. 27 at 13-22. Plaintiff argued that the complaint adequately alleged all three independent grounds for a discriminatory workplace claim. *Id.*; *see also* FAC ¶¶ 37-41, 48-51, 104 (citing, *inter alia,* DEQ's affirmative action plans, its goals to hire by race until the demographics of the agency "reflect[] the demographics of Oregon," its "racial wage premium," and similar initiatives); *id* ¶¶ 42 & 115 (citing race-segregated programs); *id.* ¶¶ 61-70 (citing requirement that employees adopt tenets of racial

essentialism such as that to participate in "whiteness" is to possess stereotypical character attributes and behaviors); *see also id.* ¶ 61 ("whiteness is a death sentence"). On December 9, 2024, the Court rejected Defendants' arguments and denied the motion to dismiss. Dkt. 40. But now, Defendants refuse to provide discovery on the very claims that the Court upheld at the pleading stage.

### CERTIFICATE OF CONFERRAL

Pursuant to L.R. 7-1 and Fed. R. Civ. P. 37(a)(1), undersigned counsel for Plaintiff certifies that she has in good faith conferred with Defendants in an attempt to obtain discovery without court action. On May 31, 2024, Plaintiff served her first set of requests for production ("RFPs").[1] On July 5, 2024, after the time to respond had expired, Defendants served their Response to the RFPs.[2]

On July 29, 2024, in an attempt to come to agreement on disputed issues, Plaintiff sent Defendants a fifteen-page single-spaced letter (the "Deficiency Letter") outlining in detail all of the deficiencies in Defendants' RFP Responses.[3] The Deficiency Letter addressed each RFP under a separate heading, responded to Defendants' objections (if any) to each specific Request, and dealt with any substantive disagreements on the scope of the specific request at issue, sometimes modifying the request and sometimes insisting on production as initially requested. Ex. C at 2-13. The Deficiency Letter requested that all responsive documents be produced by August 21, 2024. *Id.* Defendants have never responded to the Deficiency Letter.

On August 27, 2024, six days after the deadline for Defendants to respond to the Deficiency letter, Plaintiff reached out to schedule a telephone conference with counsel for Defendants to discuss these issues.[4] On September 3, 2024, Defendants' counsel responded to the request, and the parties met via telephone on September 5, 2024.[5]

During the September 5, 2024 telephone conference, Plaintiff reiterated that Defendants' responses to the RFPs had been deficient as set forth in the Letter and noted surprise and disappointment that Defendants had never responded. Ex. E at 1. During the conference, Defendants

---

[1]    Attached as Exhibit A.
[2]    Attached as Exhibit B.
[3]    Attached as Exhibit C.
[4]    Email attached as Exhibit D.
[5]    Sept. 20, 2024 Letter Memorializing Sept. 5, 2024 teleconference attached as Exhibit E.

made no effort to defend or rehabilitate their prior discovery responses, but instead asserted an entirely new basis for denying document productions. *Id.* Defendants stated that they would not participate in discovery going to Plaintiff's discriminatory workplace demands because Defendants had moved to dismiss those claims and the motion to dismiss was then pending. *Id.* Plaintiff did not believe that discovery should be automatically stayed pending the motion to dismiss—and no motion to stay discovery had been filed—but agreed as a matter of comity to voluntarily suspend discovery on the discriminatory workplace claims until the motion to dismiss was finally decided. *Id.* at 1-2; *see also* Dkt. 37 ¶ 7.  The parties agreed that discovery on Plaintiff's retaliation claims, which were not subject to the motion, would go forward. Ex. E at 1-2. The motion to dismiss was finally decided in on December 9, 2024 in Plaintiff's favor. Dkt. 40. Accordingly, the prior agreement to suspend discovery became inoperative as of that time.

Despite this change in the litigation posture, Defendants have not produced documents on the discriminatory workplace claims, and have not responded to the Deficiency Letter. The parties next appeared before the Court on February 5, 2025 for a scheduling conference. Dkt. 46. During the conference, Plaintiff noted that the prior voluntary suspension of discovery was lifted and noted her intention to file a motion to compel. The Court reminded the parties of their meet and confer obligations. Although Plaintiff had satisfied her conferral obligations through the Deficiency Letter and follow-up calls and correspondence, in a further attempt to reach voluntary agreement without Court intervention, on February 24, 2025, Plaintiff sent yet another letter.[6]  The February 24, 2025 letter reiterated that Defendants had "never responded to the Deficiency Letter and never produced the required documents." Ex. F at 3. Plaintiff noted that "the pause of discovery to which the parties agreed in September 2024 is no longer appropriate or operative," and stated that she would move the court for an order compelling discovery along the lines set forth in the Deficiency Letter. *Id.* at 4. Plaintiff did, however, extend one more opportunity to Defendants to respond to the Deficiency Letter, seeking a response "no later than March 17, 2025." *Id*.

In addition to addressing Plaintiff's discriminatory workplace claims, the February 24 letter also addressed certain discovery disputes on Plaintiff's retaliation claims, including a dispute over

---

[6]    Attached as Exhibit F.

search terms and a dispute over whether files related to an internal investigation of Plaintiff in retaliation for her speech were in the "custody and control" of Defendants. *Id.* at 4-7. Those matters are not at issue in the instant motion. On March 6, 2025, Defendants sent a brief letter concerning the retaliation-related document demands.[7] The March 6, 2025 letter did not purport to set forth a response to the Deficiency Letter and did not address the discriminatory workplace demands. The parties are, unfortunately, at an impasse, and Court intervention is required.

## ARGUMENT

Plaintiff moves pursuant to Fed. R. Civ. P. 37(a) to compel Defendants to produce responsive documents. Specifically, Plaintiff requests an order compelling Defendants to do the following six things: (1) Produce documents concerning DEQ's affirmative action programs and similar efforts to impact employment outcomes by race, as requested in RFP Nos. 4-7; (2) Produce documents regarding DEQ's "affinity groups," as requested in RFP No. 11; (3) Produce additional documents concerning DEQ's program of instruction on racial matters beyond materials generated by Engage to Change – RFP Nos. 8 & 19; (4) Produce documents containing high-frequency DEI buzzwords as requested by RFP No. 10; (5) Produce documents concerning an alleged "racist and antisemitic diatribe" referenced in Defendant Feldon's July 17, 2023 e-mail – RFP No. 20; and (6) Produce all emails that contain the Feldon e-mail anywhere in the chain – RFP No. 14.

**I.      Defendants should be compelled to produce documents concerning DEQ's affirmative action programs & similar efforts to adjust employment outcomes by race – RFP Nos. 4, 5, 6 & 7**

In RFP No. 4, Plaintiff sought all documents and communications regarding DEQ's efforts to "adjust the proportions of DEQ employees by race," and in RFP No. 5, all documents and communications regarding DEQ's efforts to "affect salaries, promotional opportunities, benefits, mentorship opportunities, and all other terms and conditions of employment based on race." The requests specified that such efforts included not only DEQ's "affirmative action programs," but also all similar "formal and informal" efforts. At a bare minimum, the requests covered draft and final affirmative action plans, communications regarding such plans, source materials considered in plan development, statistical outcome measures, plan approvals and similar documents. The request also

---

[7]      Attached as Exhibit G.

covered other formal and informal efforts at racial balancing such as the activities of the "DEI Council," an internal body whose sole purpose is to advance the prospects of minority racial groups.

In RFP Nos. 6 & 7, Plaintiff sought, for the period from September 2018 forward, all existing summaries, analyses and reports regarding employment with DEQ "that concern race," as well as raw data from DEQ's HR systems with demographic data (including race), qualification data, and outcome data such as whether an applicant was hired or promoted.

These materials are all highly relevant to Plaintiff's claims. *See, e.g.*, *Rodgers v. E.E.O.C.*, 454 F.2d 234, 237-39 (5th Cir. 1971)(discrimination against persons of the same race as the plaintiff creates a discriminatory workplace environment in violation of Title VII); *Bundy v. Jackson*, 641 F.2d 934, 945 (D.C. Cir. 1981)(same); *Jones v. W. Suffolk B.O.C.E.S.*, No. 03-CV-3252, 2005 WL 8161144, at *6 (E.D.N.Y. Mar. 11, 2005)(citing a "long line of federal cases" countenancing claims that discriminatory employment acts, even if not directly aimed at the plaintiff, can create a hostile work environment). Defendants would not be unduly burdened by producing the documents. Nevertheless, Defendants have refused to make any meaningful productions. For the following reasons, they should be compelled to do so now.

A.  *Documents responsive to RFP Nos. 4 & 5 exist and Defendants have waived any possible objections*

In their responses, Defendants did not object to RFP No. 4, Ex. B at 4, and have therefore waived any objections. *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("[I]t is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection."); *see also* D. Or. L.R. 26-5(a). As for RFP No. 5, Defendants only offered the following boilerplate: "Objection. Overbroad and vague" without explanation. Ex. B at 4. Under well-settled law, this generic statement fails to state a valid objection. *See Yufa v. Hach Ultra Analytics*, 2014 WL 11395243, at *1 (D. Or. March 4, 2014) ("Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all."); *Brooks v. Agate Res., Inc.*, 836 F. App'x 471, 474 (9th Cir. 2020).

On the substance, Defendants' entire response to RFP No. 4 was "[n]o documents responsive to this Request exist." Ex. B at 4. In their response to RFP No. 5, Defendants asserted that "'[a]ffirmative action programs' are not efforts to 'affect' terms and conditions of employment based

on race." *Id.* Defendants further asserted that "there are no efforts to limit or reduce the prospects of racial groups." *Id.* From these premises, Defendants concluded, "Defendants have no documents responsive to this Request." *Id.*

Defendants' assertions that responsive documents do not exist are plainly false and border on frivolous. In a stipulation filed with the Court, Defendants previously acknowledged that discovery in this matter "will encompass . . . DEQ's efforts to adjust the racial proportionality of its workforce in terms of hiring, promotions, salaries, influence, mentoring, opportunities for advancement, and similar items." Dkt. 16 ¶ IV(B)(1)(b). DEQ has affirmative action programs, DEI plans, and strategic planning documents that focus on increasing the number of employees of certain specific racial groups in DEQ employment, irrespective of job readiness or qualifications. Each of those plans is backed up by documents considered during the plan design phase, each plan undoubtedly generated e-mail traffic, and each was almost certainly followed up by analyses gauging plan effectiveness.

Defendants may disagree with the verbal formulation that their programs are "efforts to 'affect' terms and conditions of employment based on race," or "efforts to limit or reduce the prospects of racial groups" in employment.[8] But even if Defendants believed that their affirmative action and other programs should be described using different terms, minimum standards of good faith in the discovery process required that they respond by noting their differences of opinion with the way the Requests were phrased, and then providing a good faith counter-interpretation and producing the relevant documents. *Saleh v. Pfister*, No. 18 C 1812, 2020 WL 4365641, at *1 (N.D.

---

[8]    Lest there be any doubt, DEQ has programs that are properly described as efforts to limit the prospects of certain racial groups—Caucasian Oregonians in particular. One need look no further than DEQ's own currently-operative Affirmative Action plan which states quite frankly that DEQ's policy of disparate treatment on the basis of race has resulted in what it calls "progress" because "white representation declined" during the 2021-23 period. Excerpt of DEQ 2024-26 Affirmative Action Plan Biennial attached as Exhibit H at STATE-PROD-000984. If that does not describe an effort to "reduce the prospects" of a racial group, then nothing does. Further, DEQ has programs that even Defendants would describe as efforts to *enhance* the prospects of certain racial groups. But, of course, in the context of employment, an effort to enhance one group's outcomes necessarily implies a limitation on another group's outcomes. *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 272 n.9 (2023) (Thomas, J. concurring) ("In a zero-sum game . . . any sorting mechanism that takes race into account in any way has discriminated based on race to the benefit of some races and the detriment of others.").

Ill. July 30, 2020)(a party violates its good faith obligation if it "hid[es] behind unreasonably narrow interpretations of discovery requests"); *Eames v. Nationwide Mut. Ins.* Co., No. CIV.A. 04-1324-KAJ, 2006 WL 1237037, at *1 (D. Del. May 8, 2006) (approving sanctions against party that had engaged in "hyper technical interpretation[s] of Plaintiffs' requests and overly narrow interpretation[s] of the scope of discovery"(cleaned up)). Defendants cannot avoid their discovery obligations by purposefully misunderstanding Plaintiff's document demands. They should be compelled to produce responsive documents.[9]

B.   *Defendants offered no reason to limit their production in response to RFP Nos. 6 & 7 and should be compelled to produce the requested data on employment outcomes by race*

In response to RFP Nos. 6 and 7, which sought both raw employment data and pre-existing analyses and reports on employment outcomes by race, Defendants asserted, by way of objection, only the boilerplate statement: "Objection, overbroad and vague." Ex. B at 5. Their failure to articulate a specific objection based on reasons amounts to a waiver. *Yufa*, 2014 WL 11395243, at *1. On the substance, without explanation, Defendants limited their production to a data compilation created for this litigation "regarding the education, promotion and termination of employees at DEQ from 2019 to the present." The data compilation does not include, among other things, racial information, and is therefore quite obviously useless on issues related to DEQ's race-based employment practices. Defendants' unexplained unilateral limitation on discovery is invalid, and the Court should order the production of data as set forth in RFP Nos. 6 and 7.

---

[9]    Notwithstanding their assertion that no responsive documents exist, Defendants have produced a handful of public reports concerning their racial balancing efforts: DEQ's Affirmative Action Plan Biennium Reports for 2021-22 and 2023-25, DEQ's 2024-26 "DEI Plan," and an April 2024 Audit Report by the Oregon Secretary of State addressing DEQ's strategic plans (which focus heavily on efforts to change the racial proportions of DEQ's workforce). All of these are public documents that were already in Plaintiff's possession, and these productions in no way excuse or obviate the need for a complete response to RFP Nos. 4 & 5. Sanitized summaries are no substitute for discovery on the underlying facts, including the materials relied on in preparing DEQ's plans, analyses of their effect on the racial distribution of employment, plan approvals, drafts, and other similar materials. Indeed, as noted in the complaint, the 2019-21 version of DEQ's affirmative action plan included statistics with racial breakdowns of DEQ's applicant pools that showed potential *anti-Caucasian* bias in hiring. FAC ¶ 39. DEQ stopped publishing statistics like this in subsequent years, but the information no doubt still exists. *Id.* ¶ 165(c). Plaintiff is entitled to engage in discovery on the underlying realities beyond DEQ's self-serving public reports.

**II.    Defendants should be compelled to produce documents regarding DEQ's "affinity groups" – RFP No. 11**

In RFP No. 11, Plaintiff sought documents regarding DEQ "affinity groups." In their responses, Defendant asserted boilerplate overbreadth and vagueness objections, and further stated that because "[t]here are numerous groups and subgroups at DEQ, [Defendants did] not know what Plaintiff considers a 'DEQ affinity group.'" Ex. B at 6. This response is frivolous.

First, DEQ's own documents show that DEQ frequently uses the term "affinity group" in its internal communications. See, Ex. I (compilation) at PLA_00685 ("DEQ's Leadership Team has approved five affinity groups [as of September 2021] that are meeting regularly"), PLA_00689 (presentation by Defendant Whitman listing specific "Affinity Groups"). DEQ not only has lists of affinity groups, it provides each one with an official e-mail address, meeting facilities, and administrative support. Exhibit J. DEQ even *pays employees for time spent in affinity group activities*. *See* Ex. K (compilation). Second, Defendants themselves have previously stipulated that discovery in this case will cover "DEQ's affinity groups." Dkt. 16 § IV(B)(1)(d).

The notion that Defendants were unable to interpret the term "affinity group" in RFP No. 11 is farcical, and any possible objection has been waived by relying solely on this position. Although it was entirely unnecessary, in the Deficiency Letter, Plaintiff spelled out that, based on a preliminary review of the handful of documents disclosed thus far in the litigation, it was clear that DEQ had at least the following affinity groups: "Allies for Racial Justice," "Black, Indigenous, People of Color (BIPOC)-managers," and "Black, Indigenous, People of Color (BIPOC)-staff." Ex. C at 9-10. Defendants have never responded to the Deficiency Letter, and should be compelled to produce documents responsive to this request.

**III.    Defendants should be compelled to produce additional documents concerning DEQ's program of instruction on racial matters – RFP Nos. 8, 10 & 19**

In RFP Nos. 8 & 19, Plaintiff sought documents and communications concerning DEQ's programs of instruction on DEI, including "internal DEI efforts," "DEI services obtained through third party contractors," and trainings on "anti-racism," "anti-bias" or similar topics. After asserting boilerplate objections, Defendants unilaterally limited their productions to "information provided to DEQ by Engage to Change." Ex. B at 5 & 9. While this is a step in the right direction, it is

incomplete. Engage to Change is not the only purveyor of DEI instruction at DEQ. DEQ has several internal groups whose primary mission is to advance the tenets of DEI, including the *DEI Council* and the DEQ BIPOC Staff Group.  *See, e.g.*, Ex. I; *see also* Ex. L. Other groups, such as the DEQ Strategic Planning Steering Committee, focus heavily on race-based decision making. Exhibit M at ETC-PRODUCTION-0008070 *et seq.* DEQ also incorporates DEI efforts of outside groups, such as the State of Oregon Racial Justice Council. DEQ's Human Resources Department also regularly publishes materials instructing employees on "anti-racism" and other DEI topics. All of these groups produce DEI messaging and materials, not just Engage to Change. Defendants' limitation was improper, and they should be compelled to produce documents that have been withheld.

In RFP No. 10, Plaintiff sought documents containing a handful of high-frequency DEI buzzwords such as "whiteness," "white privilege," "antiracism," "fragility," "allyship" and similar terms. The probability that documents containing these terms will be relevant to Plaintiff's discriminatory workplace claims is very high. Defendants did not object to producing such documents, but, incredibly, claimed that the request was "impossible to understand." Ex. B. at 6. This is a disingenuous response. These terms appear over and over again in DEQ's official communications and training materials. *See, e.g.*, Ex. N (compilation). Defendants understand these terms, and they cannot discharge their discovery obligations by playing at ignorance. *See, e.g.*, *Antiaging Inst. of Cal. v. Solonova, LLC*, 2016 WL 6920676, at *2 (C.D. Cal. Jun. 29, 2016)(rejecting discovery objections based on a party's "feigned confusion over the meaning of common words in the English language").

Moreover, even feigned ignorance doesn't work here. As was spelled out in the Deficiency Letter, responsive documents are easy to identify—all that is required is to use the words set forth in RFP No. 10 as search terms, and to produce the resulting documents. Defendants have not objected on any basis other than their claim that RFP No. 10 is "impossible to understand," and they have waived any objections that might have been raised. They should be compelled to produce the responsive documents.

Defendants should not be allowed to raise new objections at this late stage. *Richmark Corp.*, 959 F.2d at 1473 ("[T]he court will not consider any objections that were not asserted in the

responding party's *original* discovery responses." (emphasis in original)). Plaintiff nevertheless anticipates that Defendants may attempt to argue that some documents containing the terms set forth in RFP No. 10 are irrelevant because they will include instances where DEQ was communicating views on such things as "whiteness" to employees other than Ms. Johnson. While employees understandably experience distress during the time they are being exposed to racially hostile instruction, the hostility does not end when they leave the DEI training rooms or get to the end of "anti-racist" pamphlets. As alleged in the complaint, and as confirmed by empirical research, exposing employees to DEI materials like the ones used by DEQ creates a feedback loop that spreads racial hostility throughout the workplace far beyond the point of exposure. That is because other employees take these messages to heart and are "primed to be more hostile in their everyday interactions going forward." FAC ¶ 165(g). You can see the results regularly at DEQ, where it is "commonplace . . . to hear employees, including managers and supervisors, make derogatory statements about white people." *Id.* ¶ 86; *see also id.* ¶¶ 67-90. DEQ adds to the racial hostility of the working environment every time it instructs employees to adopt the tenets of DEI. This is true whether or not Ms. Johnson is in the room. Accordingly, the sought-after materials are relevant whether or not they explicitly reference Ms. Johnson.

IV.    **Defendants should be compelled to produce documents going to retaliation and the impact on plaintiff's professional reputation – RFP Nos. 14 & 20**

In RFP Nos. 14 & 20, Plaintiff sought documents and communications concerning the July 11, 2024 DEI training and its aftermath, in particular, the impact of the July 17, 2023 Feldon email.

A.    *Defendants should be compelled to produce documents on the "racist and antisemitic diatribe" – RFP No. 20.*

In RFP No. 20, Plaintiff sought documents concerning the alleged "racist and antisemitic diatribe" referenced in the Feldon e-mail. Defendants refused to produce such documents on the ground of confidentiality. Defendants' entire response to RFP No. 20 follows:

> The July 17, 2023 email, attached as Exhibit 9 to the Complaint, referred to an employee, <u>not</u> plaintiff, who listened to an antisemitic recording during a DEQ videoconference and failed to mute the antisemitic recording. The employee, a non-party, was investigated and disciplined. The investigation and discipline involved a non-party and the reports are confidential.

Ex. B at 9.

This response fails. The Court has entered a Protective Order in this case that specifically contemplates the production of confidential information and imposes appropriate safeguards. Dkt. 20. If Defendants believe any specific document or part of a document responsive to RFP No. 20 contains information that should be deemed "Confidential" or "Attorneys' Eyes Only," the protective order sets forth a procedure for making such a claim. Accordingly, the objection is not well taken. *Antiaging Inst. of California*, 2016 WL 6920676, at *2; *see also Daniels v. G4S Secure Solutions USA, Inc.*, 2021 WL 3742039, at *5 (C.D. Cal. Jan. 4, 2021). Because Defendants did not assert any other grounds for withholding these documents, they have waived any other potential objections, and should be compelled to produce the requested documents.

Plaintiff anticipates that Defendants may attempt to argue that materials relating to the "diatribe" are not relevant. The Court should disregard any such argument as waived, but even if it were to be entertained, it would not win the day. The Feldon e-mail begins by asserting that there have been "***two recent public incidents*** that have shown our agency has much work ahead of us as we move toward a workplace culture that embraces anti-racism and equity." FAC Ex. 9 (emphasis added). It goes on to say that the "incidents" (both of them, not just the "racist and antisemitic" one) "harmed" "BIPOC" employees. *Id.* One of those incidents was Ms. Johnson asking questions at the July 11, 2023 DEI training. The e-mail goes on further to suggest that persons who "witnessed the two incidents" or "those who may have heard about them," should ruminate on the "impact on yourself and your colleagues," and apologizes for the "harm" caused. *Id*. The e-mail, thus paints these "two incidents" as on a par with one another. It hardly matters, therefore, that the word "racist" is used only to describe the "racist and antisemitic diatribe." Both incidents are described as equally despicable, and both are described as impediments to "anti-racism." And, more to the point, it is obviously plausible to believe that recipients of the e-mail understood it to refer to Ms. Johnson's speech as "racist" (or at least a *barrier* to "anti-racism," which many people would take to be the same thing). Even if they didn't, information on the "diatribe" is still relevant. Defendants have not, and cannot, deny that the Feldon e-mail equates the "impact" of the two "incidents." To understand how damaging the e-mail was to Ms. Johnson's reputation, therefore, she should be allowed to explore just how bad the relevant "diatribe" was. After all, as Ms. Feldon admits in her e-mail, there

were *witnesses* to the "diatribe." *Id*. Defendant Feldon informed those witnesses and everyone else that, however bad the "diatribe" was, Ms. Johnson did something just as bad during her "aggressive resistance." *Id*. There is no plausible argument that materials related to the "diatribe" are irrelevant to Ms. Johnson's claim. *See, e.g.*, *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020)(relevance is to be "construed broadly" (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

B.    *Defendants should be compelled to produce all documents containing the July 17, 2023 Feldon e-mail and commentary thereon – RFP 14.*

With respect to RFP No. 14, the parties engaged in a dispute over the appropriate search terms to locate responsive documents. As part of a compromise effort, Plaintiff requested that Defendants produce, at a minimum, all e-mails that included the July 17, 2023 e-mail somewhere in the e-mail chain. *See* Oct. 12, 2024 E-mail from J. Kerwin, attached as Exhibit O at 2. It is entirely plausible that recipients of the e-mail may have forwarded it to others along with commentary that could shed light on just how badly Ms. Johnson's reputation was damaged. The burden of searching for e-mails encapsulating the Feldon message would be minimal. Defendants have not raised any specific objections to Plaintiff's proposal. Accordingly, the Court should order production of all DEQ e-mails in which Leah Feldon's July 17, 2023 e-mail appears anywhere in the chain.

CONCLUSION

For the forgoing reasons Plaintiff respectfully requests that the Court issue an order compelling Defendants to:

1) Produce documents concerning DEQ's affirmative action programs and similar efforts to adjust employment outcomes by race as requested in RFP Nos. 4, 5, 6 & 7;

2) Produce documents regarding DEQ's "affinity groups" as requested in RFP No. 11;

3) Produce additional documents concerning DEQ's program of instruction on racial matters beyond materials provided by Engage to Change – RFP Nos. 8 & 19;

4) Produce documents with high-frequency DEI buzzwords, as requested in RFP No. 10;

5) Produce documents concerning an alleged "racist and antisemitic diatribe" referenced in Defendant Feldon's July 17, 2023 e-mail; and

6) Produce all emails in which the Feldon e-mail appears anywhere in the chain.

DATED this 27th day of March 2025.

Respectfully submitted,

_/s/ James L. Kerwin_

James L. Kerwin*
William E. Trachman*
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, Colorado 80227
Tele: (303) 292-2021
Fax: (877) 349-7074
jkerwin@mslegal.org
wtrachman@mslegal.org
*_Pro Hac Vice_

Herbert G. Grey, Attorney at Law
OSB No. 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005
(503) 641-4908
herb@greylaw.org

_Attorneys for Plaintiff_